IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 4, 2001 Session

## HECK VAN TRAN v. STATE OF TENNESSEE

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. P-14409   John P. Colton, Judge**

---

### No. W2000-00739-SC-R11-PD - Filed December 4, 2001

---

We granted this appeal to determine whether the trial court and the Court of Criminal Appeals erred by denying the petitioner's motion to reopen his post-conviction petition. In his motion, the petitioner asserted that new evidence establishes that he is mentally retarded and, therefore, ineligible for the death penalty under Tenn. Code Ann. § 39-13-203, which prohibits the execution of the mentally retarded. The petitioner also argued on appeal that the Eighth Amendment to the United States Constitution and article I, § 16 of the Tennessee Constitution prohibit the execution of mentally retarded individuals.

After careful consideration, we conclude that the General Assembly did not clearly intend to apply Tenn. Code Ann. § 39-13-203 retroactively and that the statute therefore provides no basis to reopen a post-conviction suit for a petitioner who was sentenced before its effective date. We also conclude, however, that the Eighth Amendment to the United States Constitution and article I, § 16 of the Tennessee Constitution prohibit the execution of mentally retarded individuals because such executions violate evolving standards of decency that mark the progress of a maturing society, are grossly disproportionate, and serve no valid penological purpose in any case. We therefore reverse the judgment of the Court of Criminal Appeals and remand the case to the trial court for further proceedings.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Reversed;**
**Remanded to Trial Court**

E. RILEY ANDERSON, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and ADOLPHO A. BIRCH, JR., join. WILLIAM M. BARKER, J., filed a concurring and dissenting opinion, in which JANICE M. HOLDER, J., joined.

Brock Mehler, Nashville, Tennessee, and William D. Massey, Memphis, Tennessee, for the appellant, Heck Van Tran.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Alice B. Lustre and Jennifer L. Smith, Assistant Attorneys General, Nashville, Tennessee, for the appellee, State of Tennessee.

## OPINION

### Background

In 1989 the petitioner, Heck Van Tran, was convicted of three counts of felony murder and sentenced to death on each count for his role in killing three people during a robbery at a Memphis restaurant. On appeal, this Court affirmed all three of the murder convictions and one of the death sentences. State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993).[1]

While this case was pending on direct appeal, the General Assembly enacted Tenn. Code Ann. § 39-13-203 (1991), which provided in part as follows:

> (a) As used in this section, "mental retardation" means:
>
> (1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;
>
> (2) Deficits in adaptive behavior; and
>
> (3) The mental retardation must have been manifested during the developmental period, or by eighteen (18) years of age.
>
> (b) Notwithstanding any provision of law to the contrary, no defendant with mental retardation at the time of committing first degree murder shall be sentenced to death.
>
> (c) The burden of production and persuasion to demonstrate mental retardation by a preponderance of the evidence is upon the defendant. The determination of whether the defendant was mentally retarded at the time of the offense of first degree murder shall be made by the court.

---

[1] Two of the death sentences were remanded for resentencing on the basis that the evidence was insufficient to establish one of the aggravating circumstances relied upon by State and that the error was not harmless beyond a reasonable doubt. State v. Van Tran, 864 S.W.2d at 480. On remand the petitioner received two concurrent life sentences for these offenses.

(e) If the issue of mental retardation is raised at trial and the court determines that the defendant is not a person with mental retardation, the defendant shall be entitled to offer evidence to the trier of fact of diminished intellectual capacity as a mitigating circumstance pursuant to § 39-13-204(j)(8).

This statute became effective on July 1, 1990.[2]

On March 7, 1995, Van Tran filed a petition seeking post-conviction relief that relied in part upon this statute as a basis for setting aside his sentence of death. An evidentiary hearing was conducted in October of 1997. Prior to this hearing, Dr. Andrew J. Adler, a licensed psychologist, tested petitioner using the Wechsler Adult Intelligence Scale-Revised ("WAIS-R")[3] and a Vineland Adaptive Behavior Scale. Dr. Adler testified at the post-conviction hearing in 1997 that petitioner had a full scale I.Q. of 67 and that he had deficits in adaptive behavior that had manifested during the developmental period before the age of eighteen (18). Dr. Adler concluded that the petitioner was mentally retarded as defined by Tenn. Code Ann. § 39-13-203(a).

Dr. Lynn Zager, a psychologist called as a witness by the State, testified that the petitioner's I.Q. was actually 72 with a standard error measurement of plus or minus three, rather than 67 as testified by Dr. Adler. Dr. Zager testified that Dr. Adler had made a clerical error in applying the conversion chart. The trial court credited Dr. Zager's testimony and dismissed the petition for post-conviction relief. The dismissal was affirmed both by the Court of Criminal Appeals and by this Court without addressing the statutory or constitutional issue of executing a mentally retarded defendant. See Van Tran v. State, No. 02C01-9803-CR-00078, 1999 WL 177560, at *6 (Tenn. Crim. App. Apr. 1, 1999); Van Tran v. State, 6 S.W.3d 257 (Tenn. 1999).

In December of 1999, Dr. Adler again tested the petitioner's I.Q., this time using the Wechsler Adult Intelligence Scale -Third Edition ("WAIS-III"), an updated version of the WAIS-R. Dr. Adler determined that petitioner's full-scale I.Q. is 65. Relying upon this data, petitioner filed

---

[2]     This statute, which is now codified in Tenn. Code Ann. § 39-13-203 (1997), adopted the nationally accepted definition of mental retardation. See Penry v. Lynaugh, 492 U.S. 302, 308 n.1, 109 S. Ct. 2934, 2941, n.1, 106 L. Ed. 2d 256 (1989) ("Persons who are mentally retarded are described as having 'significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the developmental period.' American Association on Mental Deficiency (now Retardation) (AAMR), Classification in Mental Retardation 1 (H. Grossman ed. 1983)). To be classified as mentally retarded, a person generally must have an IQ of 70 or below. Id., at 11.").

[3]     During the original trial in 1989, evidence was introduced to show that the petitioner had below average intellectual functioning, but no standardized test was administered, and there was no evidence introduced as to his intelligence quotient ("I.Q.").

a motion on February 7, 2000 seeking to reopen his previous post-conviction petition pursuant to Tenn. Code Ann. § 40-30-217 (1997), which provides in pertinent part:

> (a) A petitioner may file a motion in the trial court to reopen the first post-conviction petition only if the following applies:
>
> (1) The claim in the motion is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required. Such motion must be filed within one (1) year of the ruling of the highest state appellate court or the United States supreme court establishing a constitutional right that was not recognized as existing at the time of trial; or
>
> (2) The claim in the motion is based upon new scientific evidence establishing that such petitioner is actually innocent of the offense or offenses for which the petitioner was convicted; or
>
> * * *
>
> (4) It appears that the facts underlying the claim, if true, would establish by clear and convincing evidence that the petitioner is entitled to have the conviction set aside or the sentence reduced.

The motion was accompanied by an affidavit from Dr. Adler stating both the results of the WAIS-III and Dr. Adler's conclusion that the petitioner is mentally retarded as defined by Tenn. Code Ann. § 39-13-203(a).

The trial court issued a preliminary order denying the petitioner's motion to reopen, and the Court of Criminal Appeals denied the petitioner's application for permission to appeal. Thereafter, the petitioner filed an application for permission to appeal which this Court granted. Following oral argument, this Court entered a unanimous order directing the parties to file supplemental briefs addressing an issue of first impression for this Court: whether the Eighth Amendment to the United States Constitution or article I, § 16 of the Tennessee Constitution prohibits executing a mentally retarded defendant. For the following reasons, we reverse the judgments of trial court and the Court of Criminal Appeals and remand the case to the trial court for further proceedings.

### Mental Retardation

Although the statutory definition of mental retardation in Tennessee adopts the nationally accepted definition of mental retardation, see Penry v. Lynaugh, 492 U.S. 302, 308 n.1, 109 S. Ct. 2934, 2941 n.1, 106 L. Ed. 2d 256 (1989), no commentary or background is provided on the nature of mental retardation. As one writer has observed, "mental retardation is a debilitating mental defect

that is understood by few and accepted by even fewer."  Juliet L. Ream, <u>Capital Punishment for Mentally Retarded Offenders: Is it Morally and Constitutionally Impermissible?</u>, 19 Sw. U. L. Rev. 89, 106 (1990).  To provide some understanding and context, we will briefly discuss the general characteristics and background of mental retardation before turning to the precise issues in this case.

The Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)[4] defines a mentally retarded person as one who has "significantly subaverage general intellectual functioning" accompanied by "significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/ interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety."  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 39 (4th ed. 1994).  Like the statutory definition, the DSM-IV requires that the intellectual and adaptive deficits manifest themselves by the time the person is eighteen years of age.  <u>Id.</u>

The first part of the definition – subaverage general intellectual functioning –  is based on Intelligence Quotient ("I.Q.") scores that are obtained through the use of standardized intelligence tests.  The DSM-IV uses the following scales:

> IQ of 50-55 to approximately 70: mild mental retardation
>
> IQ of 35-40 to 50-55: moderate mental retardation
>
> IQ of 20-25 to 35-40: severe mental retardation [and]
>
> IQ below 20-25: profound mental retardation.

<u>Id.</u> at 40.  To put these scales into a broader context, the DSM-IV states that mental retardation has a prevalence rate of about one percent of the population.  Of this one percent, eighty-five percent are mildly retarded; ten percent are moderately retarded; three to four percent are severely retarded; and one to two percent are profoundly retarded.  <u>See</u> <u>id.</u> at 41-42.

The second part of the definition – adaptive functioning – "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, socio-cultural background, and community setting."  <u>Id.</u> at 40.  As discussed, a mentally retarded person will have significant limitations in at least two of the following basic skills: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills,

---

[4]     The DSM-IV is the treatise referred to and relied upon in the mental health field for the discussion and diagnosis of mental disorders. We refer to it for the purpose of providing insight and background into mental retardation and not for the purpose of expanding upon or interpreting the statutory definition in Tennessee.  <u>See</u> <u>State v. Smith</u>, 893 S.W.2d 908 (Tenn. 1994)**.**

work, leisure, health, and safety." Id. at 39. Influences on adaptive functioning may include the individual's "education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation." Id. at 40.

Despite the various classifications and wide range of factors, the DSM-IV makes it crystal clear that all mentally retarded individuals bear substantial limitations in both intelligence and functioning.[5] All persons with mild mental retardation may attain academic skills up to only the sixth grade level, but some may attain various levels of life and work skills with supervision and support. Id. at 41. A person with moderate mental retardation may learn to attend to self-care and perform basic work skills under supervision, yet can attain academic skills up to only the second grade level. Id. A person with severe mental retardation may learn to talk and may be trained in elementary self-care skills with supervision. Id. Finally, a person with profound mental retardation displays significant impairments and requires constant care in a highly structured and supervised environment. Id. at 41-42.

There are, therefore, varying degrees of mental retardation, yet each is by definition marked by significant and serious impairments to intelligence and adaptive functioning. As one commentator has said, "The[] labels [of mental retardation] should be cautiously applied . . . because they may be misleading – mildly retarded people are substantially disabled, but only mildly so when compared to other [mentally retarded people]." Capital Punishment for Mentally Retarded Offenders, 19 Sw. U. L. Rev. at 107 (emphasis added).

As we examine the nature and characteristics of mental retardation, we find it striking that the substantial impairments of all mentally retarded individuals outlined above are largely ignored in the dissenting opinion. Indeed the premise of the dissent is that the "mere fact" of mental retardation warrants no constitutional consideration unless accompanied by a cognitive, moral, or volitional incapacity such as the inability to distinguish right from wrong, understand the nature of one's actions, or conform one's conduct to the requirements of law. The dissent offers no controlling or persuasive Tennessee authority for its analysis of mental retardation and its effects; indeed, neither the nationally recognized definition of mental retardation nor the statute enacted by the Tennessee legislature contains the cognitive, moral, or volitional components argued by the dissent.

Instead, the dissent argues that State v. Laney, 654 S.W.2d 383 (Tenn. 1983), is dispositive of the constitutional issue in this case. The defendant in Laney, however, had an I.Q. over 70 and argued only that the execution of a person with "low intelligence" was cruel and unusual

---

[5] Indeed, the American Association for Mental Retardation, (AAMR), no longer uses the terms "mild," "moderate," "severe," or "profound." See Lyn Entzeroth, Putting the Mentally Retarded Criminal Defendant to Death: Charting the Development of a National Consensus to Exempt the Mentally Retarded From the Death Penalty, 52 Ala. L. Rev. 911, 915 (2001). It has instead developed a profile based on the levels of support that a mentally retarded person may require, such as "intermittent, limited, extensive and pervasive." See id. at 915 n.41.

punishment. Moreover, Laney was decided prior to the passage of Tenn. Code Ann. § 39-13-203 (1991). Accordingly, even a cursory review of Laney reveals that this Court did not address mental retardation, its implications, or the constitutionality of executing mentally retarded defendants under article I, § 16 of the Tennessee Constitution.

Moreover, the dissent's analysis would, in numerous instances, effectively require the mentally retarded offender to all but establish an affirmative defense of legal insanity in order to avoid the death penalty. See Tenn. Code Ann. § 39-11-501(a) (1997). This argument avoids the constitutional issue in this case given the fact that the legally insane are already constitutionally protected from execution. See Van Tran v. State, 6 S.W.3d at 262. Accordingly, we undertake our review while bearing in mind the nationally recognized fact that every person who is mentally retarded has significant and serious impairments to intelligence and everyday functioning.

## Retroactive Application

Given this background and understanding of mental retardation, it is hardly surprising that in 1990 the Tennessee legislature enacted legislation to prohibit the execution of mentally retarded persons. See Tenn. Code Ann. § 39-13-203 (1991). Eighteen other jurisdictions have also prohibited such executions by statute.[6] A threshold issue in this case is whether the Tennessee statute prohibiting imposition of a death sentence upon persons who are mentally retarded applies retroactively to mentally retarded prisoners who had been sentenced to death in Tennessee before July 1, 1990, the effective date of the statute.

The petitioner asserts that the General Assembly did intend for the statute to be retroactively applied and that this intent is implicit in subsection (b) of the statute stating that it applies "notwithstanding any provision of law to the contrary." Furthermore, the petitioner argues that this Court should apply the rule of leniency, which mandates that any ambiguity be resolved by construing a statute in favor of the defendant. Since his case was pending on appeal on July 1, 1990, the effective date of the statute, the petitioner contends that, both as a matter of policy and by analogy to constitutional rules that are applied to cases still in the appellate process when the rule is announced, this new, "remedial" statute should be retroactively applied to his case.

The State responds, however, that the General Assembly did not intend to give retroactive application to Tenn. Code Ann. § 39-13-203 because the statute provided only an effective date of

---

[6] See 2001 Ariz. Legis. Serv. ch. 260 (S.B. 1551) (West); Ark. Code Ann. § 5-4-618; Colo. Rev. Stat. Ann. § 16-9-402; 2001 Conn. Legis. Serv. P.A. 01-151 (S.B. 1161) (West); 2001 Fla. Sess. Law Serv. ch. 2001-202 (C.S.S.B. 238 (West); Ga. Code Ann. § 17-7-131; Ind. Code Ann. §§ 35-36-2-5 & 35-36-9-2, et seq.; Kan. Crim. Code Ann. § 21-4623, et seq.; Ky. Rev. Stat. Ann. § 532.140; Md. Ann. Code of 1957, art. 27, § 412; 2001 Mo. Legis. Serv. S.B. 267 (Vernon's); Neb. Rev. Stat. § 28-105.01; N.M. Rev. Stat. § 31-20A-2.1; N.Y. Crim. Proc. Law § 400.27; 2001 N.C. Legis. Serv. S.B. 173 (West); S.D. Codified Laws § 23A-27A-26.1; Tenn. Code Ann. § 39-13-203; Wash. Rev. Code Ann. § 10.95.030; see also 18 U.S.C.A. § 3596.

July 1, 1990, and it contained no other specific language requiring retroactive application.[7] The State relies upon the general rule of statutory construction which provides that statutes are to be applied prospectively in the absence of clear legislative intent to the contrary. Citing numerous Public Acts, the State argues that when the General Assembly intends to apply a statute retroactively, specific language indicating this intent is included in the statute.[8]

The State also notes that the express language of the statute governed only future sentencing hearings, *i.e.*, "no defendant with mental retardation at the time of committing first degree murder shall be sentenced to death." Tenn. Code Ann. § 39-13-203(b) (1991). The State contends that this language is a clear expression of the General Assembly's intent that the statute apply only to sentencing hearings occurring after its effective date of July 1, 1990. According to the State, the General Assembly expressed its intent that the statute apply prospectively by failing to include a method by which persons already sentenced to death could raise the issue of mental retardation.

We agree that it is a well-settled rule that statutes are to be applied prospectively in the absence of clear legislative intent to the contrary. See, e.g., State v. Cauthern, 967 S.W.2d 726 (Tenn. 1998). With respect to the specific Tennessee mental retardation statute, we also agree with the State that there is no express language indicating that it must be given retroactive application. The General Assembly included only an effective date of July 1, 1990, with no language requiring the statute to be applied to death sentences imposed before that date. Moreover, the statute does not contain a procedure by which mentally retarded persons sentenced to death before July 1, 1990, can raise mental retardation as a bar to execution, nor does it mention post-conviction proceedings as an avenue for challenging a death sentence on the basis of mental retardation.[9]

On the other hand, the petitioner correctly points out that the statute contained language making it applicable "notwithstanding any provision of law to the contrary." See Tenn. Code Ann. § 39-13-203(b) (1991). In our view, this broad, ambiguous language warrants examination of the legislative history of the statute to determine legislative intent. Notably, during Senate debates on the bill, an amendment was offered to explicitly provide that the statute apply only to persons who committed first degree murder after its effective date. That amendment met with disapproval and was withdrawn without a formal vote. One Senator spoke strongly against the amendment:

> Why have this amendment? If we are going to establish a state policy
> that what we have done in times past is wrong and that from a certain

---

[7] See 1990 Tenn. Pub. Acts ch. 1038.

[8] See, e.g., 1994 Tenn. Pub. Acts ch. 552 ("This act shall take effect upon becoming a law, the public welfare requiring it, and shall be retroactive in application to January 1, 1990."); 1993 Tenn Pub. Acts ch. 387 ("This act shall take effect upon becoming a law, the public welfare requiring it, and shall apply retroactively to any applicable process, warrant, precept or summons that has been held for more than five (5) years.").

[9] Similarly, the 1995 Post-Conviction Procedures Act does not mention mental retardation as a basis for reopening a prior petition for post-conviction relief so as to challenge a sentence of death.

date we're going to correct our error, I just don't understand that. I understand that . . . maybe we want to hold costs down, but I don't understand how that balances with the importance of this bill, and I don't think we ought to adopt this amendment. If what we're doing here is right, and I think it is right, then it ought to be the right for everybody and not some people cut off by a certain date in time.

Tenn. S., Debate on H.B. 2107 on the Floor of the Senate, 96th Gen. Assembly, 2nd Reg. Sess. (Apr. 12, 1990) (Tape S-106B) (Substituted for S.B. 1851) (remarks of Sen. Lewis). The legislature's failure to clearly provide for retroactive operation may have been a product of oversight or may have been based on the assumption that no prisoner then on death row was mentally retarded. See Tenn. H.R., Debate on Tenn. H.B. 2107 on the Floor of the House, 96th Gen. Assembly, 2nd Reg. Sess. (Apr. 5, 1990) (Tape H-62) (remarks of Rep. Jackson) (stating, in response to a question, that there were no mentally retarded inmates on Tennessee's death row at that time).

In any event, although the issue as to retroactive application of the statute is close, we conclude that the absence of express language providing for retroactive application supports the conclusion that the legislature did not expressly intend such an application. As the State contends, other Public Acts demonstrate that when retroactive application is intended, the General Assembly includes specific, clear language expressing its intent. Such clear language is absent from Tenn. Code Ann. § 39-13-203. In short, notwithstanding the presence of some ambiguous language in the statute and in the legislative history, there is no evidence of a clear legislative intent to apply the statute retroactively as required by the general rule. We therefore conclude that the trial court and Court of Criminal Appeals properly denied the petitioner's motion to reopen on this ground. See Tenn. Code Ann. § 40-30-217(a)(2) (1997).

## Constitutional Principles

We next turn to the argument that the execution of mentally retarded persons constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and article I, § 16 of the Tennessee Constitution. Although the argument was not expressly set out in the defendant's motion to reopen, we ordered the parties to file supplemental briefs on this constitutional issue because it is uniquely intertwined with the statutory issue and the critical, overriding question of whether a defendant who is mentally retarded may legally be executed in this State.

Although the Court was unanimous in its determination to reach this critical constitutional issue, and the State has not objected, the dissent now argues that the issue should be avoided.[10] The dissent's arguments are misplaced. A motion to reopen, by definition, is based on a new legal issue or new scientific evidence of actual innocence that serves as a new basis to "reopen" the earlier post-conviction proceeding. Tenn. Code Ann. § 40-30-217(a) (1997). Having identified that the unique but narrow circumstances of this case raise serious constitutional implications of first impression, a majority of this Court has decided to address these critical issues.[11] As noted, the State has raised none of the procedural objections argued by the dissent and the parties have neither briefed nor argued them. As this Court has very recently said, "'[T]he importance of correctly resolving constitutional issues suggests that constitutional issues should rarely be foreclosed by procedural technicalities.'" In re Adoption of E.N.R., 42 S.W.3d 26, 32 (Tenn. 2001) (citation omitted).

We therefore begin our review of this issue by examining the relevant constitutional provisions. The Eighth Amendment provides that "[e]xcessive bail shall not be required, no excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The language in article I, § 16 is nearly identical: "That excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Tenn. Const. art. I, § 16.

One of the first cases in which the United States Supreme Court analyzed the phrase "cruel and unusual punishment" was Weems v. United States, 217 U.S. 349, 30 S. Ct. 544, 54 L. Ed. 793 (1910). In holding that a sentence of 15 years of hard, enchained labor for the offense of falsification of a public document was cruel and unusual punishment, the Court said:

> Time works changes, brings into existence new conditions and purposes. Therefore a principle, to be vital, must be capable of wider application than the mischief which gives it birth.
>
> . . .
>
> The [cruel and unusual punishments clause], in the opinion of learned commentators, may be therefore progressive, and is not fastened to the obsolete, but may acquire meaning as public opinion becomes enlightened by a humane justice.

---

[10] Although not raised in briefing by the State, the dissent cites the doctrine of waiver and this Court's decision in West v. State, 19 S.W.3d 753 (Tenn. 2000), which held that the plain error doctrine is not applicable in post-conviction. This Court has never discussed the applicability of these doctrines in the context of a motion to reopen, which by definition must be founded upon a new legal issue or newly discovered scientific evidence of actual innocence. Moreover, the Court has never discussed the applicability of these doctrines under circumstances similar to this case.

[11] See, e.g., Fletcher v. State, 951 S.W.2d 378 (Tenn. 1997) (holding that this Court has authority to review an appeal from the denial of a motion to reopen despite the absence of a statutory provision governing such review by the Supreme Court).

Weems v. United States, 217 U.S. at 373, 378, 30 S. Ct. at 551, 553 (citations omitted).  The Court later reaffirmed this analysis of the Eighth Amendment:

> [T]he words of the Amendment are not precise, and . . . their scope is not static.  <u>The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society</u>.

Trop v. Dulles, 356 U.S. 86, 100-01, 78 S. Ct. 590, 598 (1958) (emphasis added).

With these principles in mind, the United States Supreme Court has fashioned a three-prong analysis for determining whether a punishment constitutes cruel and unusual punishment under the Eighth Amendment:

> First, does the punishment for the crime conform with contemporary standards of decency?  Second, is the punishment grossly disproportionate to the offense?  Third, does the punishment go beyond what is necessary to accomplish any legitimate penological objective?

State v. Ramseur, 524 A.2d 188, 210 (N.J. 1988) (citing Gregg v. Georgia, 428 U.S. 153, 173, 96 S. Ct. 2909, 2925, 49 L. Ed. 2d 859 (1976)).  This Court has applied the same analysis to determine whether a particular punishment constitutes cruel and unusual punishment under article I, § 16 of the Tennessee Constitution.  See State v. Black, 815 S.W.2d 166, 189 (Tenn. 1991).  As explained below, we conclude that each of these factors supports the conclusion that executing the mentally retarded is cruel and unusual punishment under article I, § 16 of the Tennessee Constitution.[12]

As the State correctly observes, the United States Supreme Court held in 1989 that the execution of mentally retarded individuals is not <u>per se</u> precluded under the Eighth Amendment to the United States Constitution.  See Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989).  Because of the nature of the analysis and its consideration of contemporary values, however, it is unclear whether executing mentally retarded persons currently violates the Eighth Amendment.  The United States Supreme Court has very recently granted certiorari to revisit its five

---

[12]     The dissent's assertion that we have cited no authority in our analysis is plainly incorrect.  We rely upon the well-established analysis of article I, § 16 as set forth in State v. Black, 815 S.W.2d at 189.  We also rely upon the definition of mental retardation accepted both nationally and in Tennessee.  We have cited no Tennessee case law which holds that it is unconstitutional to execute the mentally retarded because none exists.  Indeed, one of the fundamental roles of this Court is often to confront and to determine issues of first impression.

to four Penry decision. See Daryl Renard Atkins v. Virginia, No. 00-8452, 121852 W.L. 2001 (U.S. Sept. 25, 2001).[13]

Moreover, irrespective of whether the United States Supreme Court adheres to or overrules Penry, it is axiomatic that this Court may extend greater protection under the Tennessee Constitution than is provided by the United States Supreme Court's interpretations of the federal constitution. See State v. Black, 815 S.W.2d at 189. Accordingly, although we will refer to relevant analysis under the Eighth Amendment, all of our opinions and conclusions with respect to the execution of mentally retarded individuals – an issue of first impression for this Court – are separately and independently based upon article I, § 16 of the Tennessee Constitution.

## Evolving Standards of Decency

## Nationally

The first of the factors set forth in Black, whether the punishment conforms with contemporary standards of decency, is arguably the most crucial. The United States Supreme Court emphasized in Penry that "[t]he prohibitions of the Eighth Amendment are not limited . . . to those practices condemned by the common law in 1789. The prohibition against cruel and unusual punishments also recognizes the 'evolving standards of decency that mark the progress of a maturing society.'" Penry v. Lynaugh, 492 U.S. at 330-31, 109 S. Ct. at 2953 (citations omitted). Thus, if a punishment fails to conform with contemporary standards of decency, it is unconstitutional under the Eighth Amendment regardless of whether it satisfies the other factors of the analysis.

In defining contemporary standards of decency, a reviewing court must look to "objective evidence of how our society views a particular punishment today." 492 U.S. at 331, 109 S. Ct. at 2953 (citations omitted). In Penry, the United States Supreme Court stressed that the "clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." Id. When Penry was decided in 1989, only two states, Georgia and Maryland, had legislation prohibiting the execution of mentally retarded persons convicted of a capital offense. See 492 U.S. at 334, 109 S. Ct. at 2955. A majority of the Court concluded that these two states, even when added to the fourteen states that had no provisions for capital punishment, did "not provide sufficient evidence . . . of a national consensus." Id.

The Penry Court's conclusion with regard to societal consensus based on state legislative action alone at the time was consistent with its analogous Eighth Amendment cases. In Ford v. Wainwright, for instance, the Court found a societal consensus against the execution of the insane

---

[13] Although the Court initially granted certiorari to review this issue in McCarver v. North Carolina, ___ U.S. ___, 121 S. Ct. 1401 (Mar. 26, 2001) (order granting certiorari), the order granting certiorari was later dismissed on motion of the Attorney General of North Carolina in light of recent North Carolina legislation that retroactively prohibits execution of the mentally retarded. In spite of the Supreme Court's obvious intent to revisit this extremely serious and difficult issue first in McCarver and now in Atkins, the dissent finds the majority's holding in the present case "curiously contrary to the well reasoned" decision in Penry.

where no state permitted such executions and twenty-six states had statutes suspending executions where a convicted defendant later became legally insane. 477 U.S. 399, 408 n.2, 106 S. Ct. 2595, 2601 n.2, 91 L. Ed. 2d 335 (1986). In Thompson v. Oklahoma, a plurality indicated that a societal consensus against the execution of persons under the age of 16 existed where eighteen states had statutes requiring a minimum age of 16 at the time of the offense before execution. 487 U.S. 815, 829, 108 S. Ct. 2687, 2695, 101 L. Ed. 2d 702 (1988); see also Tenn. Code Ann. § 37-1-134(a)(1) (2001) (a minor defendant under the age of 18 at the time of the offense who is transferred to criminal court for trial as an adult is not subject to the death penalty for that offense). In sum, the two states prohibiting execution of mentally retarded persons in 1989 did not create the consensus found by members of the Court in both Ford and Thompson.

It is immediately apparent, however, that the legislative landscape following Penry has undergone a dramatic transformation. Since the decision, no fewer than sixteen states – Arizona, Arkansas, Colorado, Connecticut, Florida, Indiana, Kansas, Kentucky, Missouri, Nebraska, New Mexico, New York, North Carolina, South Dakota, Tennessee, and Washington – have joined Georgia and Maryland in enacting legislation prohibiting the execution of mentally retarded individuals.[14] The federal government likewise passed legislation prohibiting such executions.[15]

The majority of these jurisdictions enacted the legislation prohibiting the execution of mentally retarded persons following the Penry decision. Jonathan L. Bing, Protecting the Mentally Retarded From Capital Punishment: State Efforts Since Penry and Recommendations for the Future, 22 N.Y.U. Rev. L & Soc. Change 59, 116 (1996). Five states – Arizona, Connecticut, Florida, Missouri, and North Carolina – enacted the legislation after the United States Supreme Court indicated in McCarver v. North Carolina, __ U.S. __, 121 S. Ct. 1404 (Mar. 26, 2001), that it would reconsider Penry and the issue of whether a standard of decency marking a mature society has evolved against the execution of the mentally retarded. When these nineteen jurisdictions are considered along with the twelve states that do not have provisions for capital punishment, thirty-one jurisdictions now do not permit the execution of mentally retarded persons.

In addition to legislative enactments, other evidence supports the conclusion that execution of the mentally retarded is cruel and unusual punishment. The United States Supreme Court, for example, has identified "data concerning the actions of sentencing juries" as another relevant measure of contemporary standards of decency. Penry v. Lynaugh, 492 U.S. at 331, 109 S. Ct. at 2953. Although the data concerning capital jury sentencing tendencies is limited, the information

---

[14] See 2001 Ariz. Legis. Serv. ch. 260 (S.B. 1551) (West); Ark. Code Ann. § 5-4-618; Colo. Rev. Stat. Ann. § 16-9-402; 2001 Conn. Legis. Serv. P.A. 01-151 (S.B. 1161) (West); 2001 Fla. Sess. Law Serv. ch. 2001-202 (C.S.S.B. 238) (West); Ga. Code Ann. § 17-7-131; Ind. Code Ann. §§ 35-36-2-5 & 35-36-9-2, et seq.; Kan. Crim. Code Ann. § 21-4623, et seq.; Ky. Rev. Stat. Ann. § 532.140; Md. Ann. Code of 1957, art. 27, § 412; 2001 Mo. Legis. Serv. S.B. 267 (Vernon's); Neb. Rev. Stat. § 28-105.01; N.M. Rev. Stat. § 31-20A-2.1; N.Y. Crim. Proc. Law § 400.27; 2001 N.C. Legis. Serv. S.B. 173 (West); S.D. Codified Laws § 23A-27A-26.1; Tenn. Code Ann. § 39-13-203; Wash. Rev. Code Ann. § 10.95.030.

[15] See 18 U.S.C.A. § 3596.

available suggests that the punishment is no longer favored by jurors. The Capital Juror Project, a South Carolina jury study which this Court has relied upon in the past,[16] found that jurors in capital cases attached "significant mitigating potential" to evidence that the defendant was mentally retarded. Stephen P. Garvey, Aggravation and Mitigation in Capital Cases: What do Jurors Think?, 98 Colum. L. Rev. 1538, 1539 (1998). In fact, "[e]vidence that the defendant was mentally retarded was almost as powerful as lingering doubt over his guilt," with nearly 75 percent of the jurors surveyed, noting that evidence of mental retardation would make them less likely to vote for death. See id. at 1564. Although similar studies have not yet been conducted in Tennessee, the authors of the South Carolina study note that "the available data suggest [that] . . . South Carolina jurors appear to think much like jurors from several other states taken in the aggregate." Id. at 1540. Thus, though not conclusive, this study assuredly lends weight to the assertion that jurors view execution of the mentally retarded as repugnant to today's standards of decency.

Moreover, other evidence that mentally retarded persons should not be executed abounds. The execution of the mentally retarded has been condemned by numerous professional organizations involved in the treatment of mentally retarded individuals, including the American Association on Mental Retardation, the Association for Retarded Citizens of the United States, the American Psychological Association, the Association for Persons with Severe Handicaps, the American Association of University Affiliated Programs for the Developmentally Disabled, the National Association of Private Residential Resources, the New York Association for Retarded Children, Inc., the National Association of Superintendents of Public Residential Facilities for the Mentally Retarded, the Mental Health Law Project, and the National Association of Protection and Advocacy Systems. See Lyn Entzeroth, Putting the Mentally Retarded Criminal Defendant to Death: Charting the Development of a National Consensus to Exempt the Mentally Retarded from the Death Penalty, 52 Ala. L. Rev. 911, nn.8, 9 (2001) (with accompanying text). The American Bar Association, which is composed of over 400,000 members representing a large cross-section of the modern legal community, also opposes the execution of the mentally retarded. See generally Carol Steiker and Jordan Steiker, Defending Categorical Exemptions to the Death Penalty: Reflections on the ABA's Resolutions Concerning the Execution of Juveniles and Persons with Mental Retardation, 61 Law

---

[16] See State v. Hartman, 42 S.W.3d 44, 59 (Tenn. 2001) (reversing the defendant's death sentence in light of "residual doubt" evidence not presented to the sentencing jury; citing the Capital Juror Project for the proposition that "residual doubt is one of the most compelling mitigating circumstances a capital defendant can establish to improve his chances of receiving a life sentence").

& Contemp. Probs. 89 (1998). Finally, public opinion polls have repeatedly shown that, even among death penalty advocates, there is scant support for executing the mentally retarded.[17]

When this evidence is viewed in conjunction with the legislative enactments and jury studies discussed above, the conclusion is compelling: executing the mentally retarded is considered cruel and unusual punishment by numerous facets of contemporary society. Thus, there exists today evidence of a substantial societal change in attitude since 1989 and, in our opinion, that evidence warrants a different conclusion. See Ford v. Wainwright, 477 U.S. at 408, 106 S. Ct. at 2601.[18]

## Tennessee

---

[17] Indeed, the majority in Penry cited several public opinion polls including a Texas poll in which 73% opposed the death penalty for mentally retarded persons, a Florida poll in which 71% opposed the death penalty for mentally retarded persons, and a Georgia poll in which 66% opposed the penalty for mentally retarded persons. Penry, 492 U.S. at 334-35, 109 S. Ct. at 2955. As also noted by one commentator:

A large number of polls . . . reveal a striking consistency in opposition to executing the mentally retarded. . . . [A]1988 Harris poll measured opposition to this practice among three ethnic subsamples, including 2008 Caucasians (70.10% opposed); 1005 African-Americans (81.60% opposed); and 100 Asian-Americans (78.10% opposed).

Polls . . . taken before and after the Penry decision also demonstrate public rejection of the practice. In the 1987 Nebraska Annual Social Indicators Survey conducted by the University of Nebraska's Bureau of Sociological Research, 67.5% of 428 respondents opposed the death penalty in cases where the defendant was mentally retarded. In an October 1988 poll of 463 Alabama residents eighteen years or older, 71.30% of respondents opposed the death penalty in cases involving the mentally retarded. A December 1989 poll of California residents eighteen years or older found 71.60% of the 448 respondents agreed that it was "not all right" to inflict capital punishment on the mentally retarded. A recent article collecting polling data from several other states also demonstrated substantial . . . opposition to executing mentally retarded prisoners in Connecticut (84%), Georgia (66%), Indiana (74%), Kentucky (57%), Louisiana (78%), Maryland (82%), New York (82%), Oklahoma (61%), South Carolina (56%), Texas (73/45.4%), and Virginia (39%).

Bryan Lester Dupler, Another Look at Evolving Standards: Will Decency Prevail Against Executing the Mentally Retarded ?, 52 Okla. L. Rev. 593, 601-02 (1999).

[18] Although comparisons to a mentally retarded adult's "mental age" are necessarily imprecise, it is clear that the intellectual and adaptive impairments of mentally retarded adults result in a reduced ability to cope with and function in the everyday world. Penry v. Lynaugh, 492 U.S. at 346, 109 S. Ct. at 2961 (Brennan, J., concurring and dissenting). We therefore believe that legislative enactments similar to Tennessee's that prohibit the execution of minors may also be seen as relevant to the societal view opposing execution of the mentally retarded. See Thompson v. Oklahoma, 487 U.S. at 828, 108 S. Ct. at 2695.

Having surveyed the national landscape, we now likewise find substantial evidence of the evolving societal view in our own state. The Tennessee legislature, which "speaks for the people on matters of public policy of the state,"[19] joined those states trumpeting for an end to the execution of the mentally retarded. We find it particularly significant that our General Assembly was the first in the country to respond to the <u>Penry</u> decision by enacting legislation to prohibit the execution of mentally retarded individuals convicted of a first degree murder. <u>See</u> Tenn. Code Ann. § 39-13-203 (1991). The legislation was passed in the Tennessee House of Representatives by a vote of 81 to 3 and in the Tennessee Senate by a vote of 28 to 3. <u>See</u> <u>Protecting the Mentally Retarded From Capital Punishment</u>, 22 N.Y.U. Rev. L. & Soc. Change at 116. The very timing of the statute's passage, less than a year after the <u>Penry</u> Court held that execution of the mentally retarded did not violate national standards of decency, suggests that the legislature intended to reject <u>Penry</u>. The legislative history of the statute reinforces this conclusion. In Senate debates on the bill, for example, Senator Greer stated:

> Some people are framing the issue on this bill as whether you're for or against the death penalty. And that's not really the issue . . . . I favor the death penalty, but I'm going to vote for . . . [the] bill for this reason: in my view, it's just not proper in a civilized society for the State to be in the business of executing children or those who are mentally retarded, and I think we ought to pass this bill and that ought to become the policy of the State.

Tenn. S., <u>Debate on H.B. 2107 on the Floor of the Senate</u>, 96th Gen. Assembly, 2nd Reg. Sess. (Apr. 12, 1990) (Tape S-106B) (Substituted for S.B. 1851). Numerous other legislators echoed Senator Greer's concerns. <u>See</u>, <u>e.g.</u>, <u>id.</u> (statement of Sen. Darnell) ("I think this, in a civilized society, is a minimum to say that we're not going to put . . . [mentally retarded individuals] to death."); (statement of Sen. Haynes) ("From a conservative standpoint, I think it's a protection to society. . . . I happen to agree with the death penalty. I just don't believe mentally retarded people ought to be electrocuted."). Such statements are convincing evidence that the legislature, in passing this statute, consciously intended to recognize that the people of Tennessee no longer approved of executing the mentally retarded.

In considering the statute as a reflection of the emerging societal view in our state, we reject the dissent's argument that we have elevated the legislative enactment of the statutory prohibition into a constitutional rule in violation of Tenn. Const. article I, § 1 or article XI, § 3, or that we have interfered with the authority of the legislature to set and define applicable punishments in violation of Tenn. Const. article II, § 2. First, the United States Supreme Court in <u>Penry</u> stressed that "the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." 492 U.S. at 331, 109 S. Ct. at 2953. Given this language in <u>Penry</u>, a case the dissent has described as "well-reasoned," it is hardly arguable that the societal view in Tennessee is against the execution of the mentally retarded; indeed the statute was passed by nearly unanimous

---

[19]     <u>Tennessee Dept. of Mental Health v. Allison</u>, 833 S.W.2d 82, 85 (Tenn. Ct. App. 1992).

votes in both the State House of Representatives and the State Senate.[20]  Second, the dissent neglects to note that our consideration of the statute and the emerging societal view is but one prong of the three-prong analysis applicable under article I, § 16.

The Supreme Court of Georgia, faced with an issue similar to the one under consideration in this case, has also relied on their statute to hold that contemporary standards of decency no longer supported execution of the mentally retarded.  See Fleming v. Zant, 386 S.E.2d 339 (Ga. 1989).  The Court stated:

> The legislative enactment reflects a decision by the people of Georgia that the execution of mentally retarded offenders makes no measurable contribution to acceptable goals of punishment.  Thus, although there may be no "national consensus" against executing the mentally retarded, this state's consensus is clear.
>
> The "standard of decency" that is relevant to the interpretation of the prohibition against cruel and unusual punishment found in the Georgia Constitution is the standard of the people of Georgia, not the national standard.  Federal constitutional standards represent the minimum, not the maximum, protection that this state must afford its citizens.  Thus, although the rest of the nation might not agree, under the Georgia Constitution, the execution of the mentally retarded constitutes cruel and unusual punishment.

Id. at 342 (footnote and citations omitted).

Accordingly, in conducting the appropriate analysis under article I, § 16 of the Tennessee Constitution, it is unmistakably clear that the societal consensus in Tennessee, as reflected in the overwhelming vote and comments of the legislature, directly repudiates the Penry decision's constitutional sanction on executing the mentally retarded.  We therefore conclude that the execution of mentally retarded individuals violates evolving standards of decency that mark the progress of a maturing society both nationally and in the State of Tennessee.

### Proportionality

The second prong of the analysis under the Eighth Amendment to the United States Constitution and article I, § 16 of the Tennessee Constitution is whether the punishment is grossly disproportionate.  The proportionality analysis must focus upon myriad factors regarding the defendant and the offense.  As the United States Supreme Court has expressed, a court must "gauge whether a punishment is disproportionate by comparing the 'gravity of the offense,' understood to

---

[20]  As we have noted, 109 elected representatives of the people of Tennessee voted in favor of the statute prohibiting the execution of the mentally retarded, see Tenn. Code Ann. § 39-13-203 (1991), and 6 voted against it.

-17-

include not only the injury caused, <u>but also the defendant's moral culpability</u>, with the 'harshness of the penalty.'" <u>Penry v. Lynaugh</u>, 492 U.S. at 342, 109 S. Ct. at 2959-60 (Brennan, J., concurring and dissenting) (quoting in part <u>Solem v. Helm</u>, 463 U.S. 277, 292, 103 S. Ct. 3001, 3010, 77 L. Ed. 2d 637 (1983) (emphasis added)); <u>see</u> <u>also</u> <u>Enmund v. Florida</u>, 458 U.S. 782, 825, 102 S. Ct. 3368, 3391, 73 L. Ed. 2d 1140 (1982) (O'Connor, J., dissenting) (noting that the Eighth Amendment concept of "proportionality requires a nexus between the punishment imposed and the defendant's blameworthiness").

As we have emphasized, all mentally retarded individuals, regardless of their level or class of retardation, have significantly subaverage general intellectual functioning and significant limitations in adaptive functioning. The deficiencies include impaired communication and comprehension skills, poor self-concept and self-perception, impaired attention and memory capacities, and a lack of knowledge about basic facts. <u>See</u> <u>Capital Punishment for Mentally Retarded Offenders</u>, 19 Sw. U. L. Rev. at 107-08. More importantly, these and other impairments necessarily permeate every aspect of a mentally retarded individual's encounter with the criminal justice system. As one commentator has said,

> [M]ental retardation may have a significant impact on an individual who finds himself involved with the criminal justice system, particularly in the context of confessions and interrogations. It is well-recognized that mental retardation is not a per se bar to voluntary interrogations and confessions, although it may be a fact to be weighed in evaluating the voluntariness of a confession. Many mentally retarded people may be less likely to withstand police coercion or pressure due to their limited communication skills, their predisposition to answer questions so as to please the questioner rather than to answer the question accurately, and their tendency to be submissive.

<u>Putting the Mentally Retarded Criminal Defendant to Death</u>, 52 Ala. L. Rev. at 917 (emphasis added); <u>see</u> <u>also</u> Mary D. Bicknell, <u>Constitutional Law: The Eighth Amendment Does Not Prohibit the Execution of Mentally Retarded Convicts</u>, 43 Okla. L. Rev. 357, 362 (1990) ("[T]he mentally retarded individual is particularly vulnerable to any police coercion used in obtaining confession.").

The dissent's view ignores the impairments in intelligence and adaptive functioning and inquires only into whether a mentally retarded person understands the nature of his or her actions, knows right from wrong, or can conform his or her conduct to the requirements of the law. We reemphasize that the dissent's narrow view would effectively protect only those mentally retarded persons who can also establish legal insanity. Again, this constricted view misses the basic issue in this case. For example:

> [M]ental retardation, in and of itself, does not render an individual incompetent to stand trial or incompetent to enter a guilty plea. However, certain characteristics that are common among people with mental retardation, such as the tendency to be easily led, a poor understanding of the consequences of one's actions, the desire to hide one's mental retardation, and the desire to please authority figures, can affect the quality and ability of a mentally retarded person to make decisions that are in his best interest. Thus, the ability of the mentally retarded defendant to assist counsel in preparing a case and in making critical decisions about the course of a capital murder trial may be compromised.

Putting the Mentally Retarded Criminal Defendant to Death, 52 Ala. L. Rev. at 918 (emphasis added).

In short, there are fundamental concerns that necessarily bear on a mentally retarded person's mental state, culpability, blameworthiness, and the proportionality of death as a punishment. As summarized persuasively by one author:

> The most significant of all of the characteristics of the mentally retarded is that they may have impaired impulse control as well as an incomplete or immature concept of blameworthiness and causation. The first defect can result in impulsive behavior, the consequence of which the [mentally retarded individual] may have difficulty or even be utterly unable to appreciate. The second defect, the failure to appreciate the concept of blameworthiness, is the most important of all because it can render a mentally retarded offender unable to understand that certain repercussions flow from certain of his acts. This can have an enormous impact on . . . blameworthiness . . . .

Capital Punishment for Mentally Retarded Offenders, 19 Sw. U. L. Rev. at 108 (emphasis added); see also Putting the Mentally Retarded Criminal Defendant to Death, 52 Ala. L. Rev. at 918.

Finally, despite the observations of the dissent, the issue in this case is not whether the mentally retarded may possess the culpability and blameworthiness to be convicted and punished of a crime. They certainly may. The issue is also not whether the mentally retarded may plead guilty, stand trial, serve as a witness, or any of the other "facts" listed by the dissent. The issue, rather, is whether the punishment of a mentally retarded offender, who by definition suffers significantly impaired intelligence and adaptive behavior, may extend beyond life imprisonment without parole and include the extreme and maximum penalty of death under article I, § 16 of the Tennessee Constitution. As it has long been recognized, the penalty of death is "'qualitatively different'" from

any other sentence and this "'qualitative difference between death and other penalties calls for a greater degree of reliance when the death sentence is imposed.'" State v. Terry, 813 S.W.2d 420, 425 (Tenn. 1991) (quoting Woodson v. North Carolina, 428 U.S. 280, 305, 96 S. Ct. 2978, 2291 (1976), and Lockett v. Ohio, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964 (1978)).

For all of the foregoing reasons, we find persuasive the view of Justice Brennan who, writing for the four-Justice dissent in Penry, observed that the "impairment of a mentally retarded offender's reasoning abilities, control over impulsive behavior, and moral development . . . limits his or her culpability so that, whatever other punishment might be appropriate, the ultimate penalty of death is always and necessarily disproportionate to his or her blameworthiness and hence is unconstitutional." Penry v. Lynaugh, 492 U.S. at 346, 109 S. Ct. at 2961 (Brennan J., concurring and dissenting).[21] Accordingly, we hold that the execution of mentally retarded individuals is grossly disproportionate under the Eighth Amendment to the United States Constitution and article I, § 16 of the Tennessee Constitution.

### Penological Objectives

The third and final prong of the analysis is whether the execution of mentally retarded persons achieves legitimate penological objectives. The dissent asserts that this prong is satisfied because the execution of mentally retarded persons achieves the objectives of deterrence and retribution. Deterrence, obviously, is the theory that a punishment will prevent others from committing similar offenses. Ford v. Wainwright, 477 U.S. at 421, 106 S. Ct. at 2607. Retribution is the theory that a defendant be punished appropriately for the crime committed; it depends on the defendant's awareness of both the punishment and its purpose. See id.

All of the concerns that we have discussed with regard to proportionality apply with equal force to this portion of the analysis. As the Georgia Supreme Court observed, the legislative enactment that prohibited the execution of mentally retarded individuals "reflects a decision by the people . . . that [such executions] make no measurable contribution to acceptable goals of punishment." Fleming v. Zant, 386 S.E.2d at 342. The dissent in Penry reached the same conclusions:

> Since mentally retarded offenders as a class lack the culpability that is a prerequisite to the proportionate imposition of the death penalty, it follows that execution can never be the "just desserts" of a retarded offender . . ., and that the punishment does not serve the retributive goal . . . .

---

[21] We believe that reliance on the rationale of the Penry dissent is particularly appropriate in light of the fact that the Tennessee legislature's enactment of Tenn. Code Ann. § 39-13-203 (1991) was, in effect, a direct repudiation of the Penry majority decision.

Furthermore, killing mentally retarded offenders does not measurably contribute to the goal of deterrence. It is highly unlikely that the exclusion of the mentally retarded from the class of those eligible to be sentenced to death will lessen any deterrent effect the death penalty may have for nonretarded potential offenders, for they, of course, will . . . remain at risk of execution. And the very factors that make it disproportionate and unjust to execute the mentally retarded also make the death penalty of the most minimal deterrent effect so far as retarded potential offenders are concerned.

Penry v. Lynaugh, 492 U.S. at 348, 109 S. Ct. at 2962 (Brennan J., concurring and dissenting) (citations omitted).

These persuasive arguments with respect to deterrence and retribution have been echoed by several commentators:

[T]he death penalty will not deter other mentally retarded individuals from committing crimes because they are not able to weigh the cost of the criminal act, the consequences of the punishment, or the benefits of alternatives. Therefore, inflicting the death penalty on a mentally defective person becomes a process in which society seeks vengeance, not retribution or deterrence. Such a result is neither civilized, nor humane.

Constitutional Law, 43 Okla. L. Rev. at 368; see also Capital Punishment for Mentally Retarded Offenders, 19 Sw. U. L. Rev. at 139 (arguing that "incapacitation, deterrence and retribution, the three penological justifications offered in support of capital punishment, do not provide a sound superstructure for this final form of punishment, especially in cases involving the mentally retarded . . . .").

The dissent argues that execution of the mentally retarded achieves valid penological objectives unless the mentally retarded defendant also establishes the cognitive, moral, or volitional incapacity to distinguish right from wrong, understand the nature of his or her actions, or conforms his or her conduct to the requirements of the law. Moreover, to emphasize its point, the dissent engages in the fact-finding exercise of reviewing this case and concludes that the petitioner did not lack such cognitive, moral, or volitional incapacities, even though the issue has not been raised, litigated, briefed or argued by the parties.

The dissent argues that its factual findings stem from the jury's verdict. The fallacy in the dissent's claim is that no jury has ever considered the defendant's volitional, moral, and cognitive capacities, the defendant's ability to understand right from wrong, the defendant's ability to

understand the nature of his actions, or the defendant's ability to conform his conduct to the requirements of the law. Instead, the dissent has established its own standard of what marginal constitutional protection is due the potentially mentally retarded offender and then has made determinations regarding the petitioner's cognitive, moral, and volitional abilities to satisfy that standard.[22]

In any event, we do not hold that the conviction and punishment of a mentally retarded defendant never achieves valid penological goals. Rather, our conclusion is that any penological objectives attained through the execution of a mentally retarded defendant are minimal at best and insufficient for the purpose of our analysis under article I, § 16. The dissent somehow finds an inherent contradiction in the conclusion that penological objectives may be served by imposing a lesser punishment than death but not for the extreme and final punishment of death. We can only comment that no statement better illustrates the dissent's view of this case and its misapprehension of the relevant analysis. The very nature of the analysis under the Eighth Amendment or article I, § 16 asks whether a *particular* punishment is cruel and unusual. Moreover, as we have commonly recognized, a sentence of death is final, irrevocable, and "qualitatively different" than any other form or level of punishment.

Accordingly, having considered the foregoing arguments and the concerns we have previously discussed, we hold that the execution of mentally retarded individuals fails to achieve legitimate penological objectives for punishment as required by the Eighth Amendment to the United States Constitution and article I, § 16 of the Tennessee Constitution.

## Other Considerations

In reaching our conclusion, we wish to separately address the arguments that executing the mentally retarded is not cruel and unusual punishment because mental retardation may be considered by the jury as mitigating evidence and because some mentally retarded individuals may rely upon the defense of insanity. There is little in either alternative that offers reasonable safeguards to the mentally retarded or addresses the concerns outlined in this opinion.

For instance, the jury's consideration of mental retardation as a mitigating factor is by itself insufficient to address the concerns protected under the Eighth Amendment or article I, § 16. In such circumstances, evidence of mental retardation would only be weighed in conjunction with one or more aggravating circumstances, such as the heinousness of the crime or a defendant's prior record. In our opinion, the weighing process would not sufficiently isolate the consideration given to the issue of mental retardation and would not provide reasonable assurance that an individualized decision will be made as to whether the death penalty was appropriate punishment for a particular mentally retarded offender. See Penry v. Lynaugh, 492 U.S. at 347, 109 S. Ct. at 2962 (Brennan J., concurring and dissenting) ("Lack of culpability as a result of mental retardation is simply not

---

[22] In contrast, as we will discuss, *infra*, the remedy applied by the majority will require the trial court and not this Court to make the pertinent factual findings regarding the petitioner's alleged mental retardation.

isolated at the sentencing stage as a factor that determinatively bars a death sentence . . . ."). In sum, the limitations and impairments associated with mental retardation warrant more consideration than simply allowing the evidence to be weighed in the mix of aggravating and mitigating circumstances. Indeed, the Tennessee legislature obviously shared this view in the passage of Tenn. Code Ann. § 39-13-203, which prohibits imposition of a death sentence upon persons found to be mentally retarded; otherwise, it simply could have listed evidence of mental retardation as among the mitigating factors in Tenn. Code Ann. § 39-13-204(j), the first degree murder death penalty statute.

Likewise, the State's assertion that some mentally retarded persons may rely upon the defense of insanity offers little protection with regard to capital sentencing. The defense of insanity is a complete defense to criminal charges only where a defendant meets the substantial burden of proving that he or she was unable to appreciate the nature or wrongfulness of his or her acts due to a severe mental illness or defect. See Tenn. Code Ann. § 39-11-501 (1997). The relevant issue in this case, however, is not whether a mentally retarded individual may be held responsible for a criminal offense, but whether that individual may be executed as a punishment for the offense. The State, as well as the dissent, would nonetheless conclude that only a mentally retarded person who establishes a complete defense to the charged offense may be exempt from the death penalty.

Moreover, placing such a burden on the mentally retarded fails to distinguish mental retardation from mental illness. Although a mentally retarded person may also have a mental illness, the two issues are not one and the same. See Putting the Mentally Retarded Criminal Defendant to Death, 52 Ala. L. Rev. at 915. Mental retardation, by definition, is accompanied by serious limitations on intelligence and adaptive behavior; mental illness is not. Mental retardation, by definition, must also manifest by age 18; mental illness may or may not. Id. Finally, mental retardation does not equate to legal insanity, nor does it necessarily make the defense of legal insanity any easier to establish. It also bears noting that the complete defense of insanity is asserted in perhaps as few as one percent of all felony cases and is successful in even fewer. See Jodie English, The Light Between Twilight and Dusk: Federal Criminal Law and the Volitional Insanity Defense, 40 Hastings L.J. 1, 9 (1988) ("Contrary to public opinion, . . . the insanity defense is infrequently raised and even less frequently successful."). Accordingly, what the State posits as a safeguard for mentally retarded individuals is in reality no safeguard at all.


### Application of Holding

### Retroactivity

We next must determine whether our conclusion that the execution of mentally retarded persons violates the Eighth Amendment to the United States Constitution and article I, § 16 of the Tennessee Constitution constitutes a new rule warranting retroactive application.

A case "announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal government." Teague v. Lane, 489 U.S. 288, 301, 109 S. Ct. 1060, 1070,

103 L. Ed. 2d 334 (1989) (citations omitted).  In other words, "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." Id.; see also Meadows v. State, 849 S.W.2d 748, 751 (Tenn. 1993).

The United States Supreme Court has said that a new rule of federal constitutional law is to be applied in cases on collateral review only if it (1) places certain kinds of primary, private individual conduct beyond the power of the state to proscribe or (2) requires the observance of procedures implicit in the concept of ordered liberty.  Teague v. Lane, 489 U.S. at 307, 109 S. Ct. at 1073.  We have adopted a somewhat different standard in Tennessee: "a new state constitutional rule is to be retroactively applied to a claim for post-conviction relief if the new rule materially enhances the integrity and reliability of the fact finding process of the trial."  Meadows v. State, 849 S.W.2d at 755; see also Tenn. Code Ann. § 40-30-222 (1997) (citing the Teague standard for retroactivity).

In deciding Penry, the United States Supreme Court recognized that a holding that the Eighth Amendment prohibited the execution of mentally retarded persons would be a new rule because it would "'brea[k] new ground' and would impose a new obligation on the States and the Federal Government."  Penry v. Lynaugh, 492 U.S. at 329, 109 S. Ct. at 2952 (alteration in original) (citations omitted).  The Court also said that such a rule would apply retroactively on collateral review:

> [T]he first exception set forth in Teague should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense.  Thus, if we held . . . that the Eighth Amendment prohibits the execution of mentally retarded persons . . . regardless of the procedures followed, such a rule would fall under the first exception to the general rule of nonretroactivity and would be applicable to defendants on collateral review.

Id. at 330, 109 S. Ct. at 2953.

We conclude that our holding under article I, § 16 of the Tennessee Constitution likewise constitutes a new rule.  This is an issue of first impression by this Court, and the result is in no way dictated by our existing precedent.  See State v. Laney, 654 S.W.2d 383, 389 (Tenn. 1983) (stating that a defendant's "low intelligence" was a mitigating factor but did not render the death penalty cruel and unusual punishment).  Moreover, we agree with the observation in Penry that such a rule warrants retroactive application to cases on collateral review.  In sum, our holding that article I, § 16 of the Tennessee Constitution prohibits execution of those defendants who are mentally retarded materially enhances the integrity and the reliability of the fact finding process of the trial.  See Meadows v. State, 849 S.W.2d at 755; Tenn. Code Ann. § 40-30-222 (1997).

**Standards on Remand**

Our holding dictates that this case be remanded to the trial court for further proceedings on the question of whether the petitioner, Heck Van Tran, is mentally retarded. Although the petitioner's motion to reopen alleged that he had new scientific evidence that he was actually innocent under Tenn. Code Ann. § 40-30-217(a)(2), it is our view that the motion is more appropriately based on the provisions of Tenn. Code Ann. § 40-30-217(a)(1), which provides that the "claim in the motion is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the trial, if retrospective application of that right is required." As such, we need not address the requirements of Tenn. Code Ann. § 40-30-217(a)(2).

We recognize that the petitioner's motion to reopen did not, and could not at the time it was filed, assert a "final appellate ruling" with regard to the unconstitutionality of executing the mentally retarded. Having now determined that the unique circumstance of this case raises a constitutional issue that warrants review and that our holding – a new rule of constitutional law – warrants retroactive application, we believe fundamental fairness dictates that the petitioner have a meaningful opportunity to raise this issue.

The application of fundamental fairness in the context of post-conviction procedures is hardly new. In Williams v. State, 44 S.W.3d 464 (Tenn. 2001), for example, a majority of this Court agreed that attorney misrepresentation may toll the post-conviction statute of limitations *despite the presence of statutory language stating that the statute of limitations shall not be tolled for any reason.* See also Seals v. State, 23 S.W.3d 272 (Tenn. 2000) (mental incompetency may toll statute of limitations despite anti-tolling language).

Accordingly, under the unusual facts of this case, in which the petitioner has raised an issue with obvious constitutional implications that a majority of the Court has chosen to address and not ignore, we believe fundamental fairness dictates that he have an opportunity to litigate his claim under the new constitutional rule of law we have announced. Moreover, allowing the petitioner to proceed serves the interest of judicial economy given that he could simply file a new motion to reopen relying on this decision under Tenn. Code Ann. § 40-30-217(a)(1). Finally, if the dissent's procedural arguments were adopted as the majority holding of this Court, the only remaining alternative in this case would be that one potentially mentally retarded person may be executed before the issue is reviewed.

On remand, the trial court shall hear the petitioner's motion to reopen and make a determination as to the petitioner's alleged mental retardation. The applicable criteria are those presently set forth by statute: (1) significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below; (2) deficits in adaptive behavior; and (3) mental retardation manifested during the developmental period, or by eighteen (18) years of age. See Tenn. Code Ann. § 39-13-203 (1997); see also Fleming v. Zant, 386

S.E.2d at 342 (adopting and applying the statutory definition of mental retardation as the constitutional standard).

## **Conclusion**

We conclude that there is compelling evidence that the execution of mentally retarded individuals violates the evolving standards of decency that mark the progress of a maturing society both nationally and in the State of Tennessee. We also have determined that the execution of any mentally retarded individual, who by definition, has significantly subaverage intelligence functioning and deficits in adaptive behavior, is grossly disproportionate, and serves no valid penological purpose. We therefore conclude that the execution of a mentally retarded individual violates the Eighth Amendment to the United States Constitution and article I, § 16 of the Tennessee Constitution. The judgment of the Court of Criminal Appeals is reversed, and this case is remanded to the trial court for further proceedings. It appearing that the petitioner is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
E. RILEY ANDERSON, JUSTICE