IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 14, 2003 Session

## SHARON R. HURT v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 94-C-1532     Seth Norman, Judge**

_____

**No. M2002-00900-CCA-R3-PC - Filed March 14, 2003**

_____

Petitioner, Sharon R. Hurt, was convicted by a jury of first degree murder and conspiracy to commit first degree murder. The trial court sentenced Petitioner to serve consecutive sentences of life imprisonment and twenty-four years. On direct appeal, this court affirmed Petitioner's convictions and sentences. *State v. James Murray, Marcie Murray and Sharon R. Hurt*, No. 01C01-9702-CR-00066, 1998 Tenn. Crim. App. LEXIS 1323, 1998 WL 934578 (Tenn. Crim. App., filed at Nashville, Dec. 30, 1998), *perm. to app. denied* (Tenn., June 28, 1999). On September 4, 2001, Petitioner filed a petition for post-conviction relief, in which she alleged the existence of new scientific evidence establishing her actual innocence. The State sought to dismiss the petition. The trial court dismissed the petition, finding that Petitioner failed to show the existence of new scientific evidence, and the petition was therefore barred by the statute of limitations. After a review of the record, we affirm the judgment of the trial court.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Peter J. Strianse, Nashville, Tennessee, for the appellant, Sharon R. Hurt.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Kathy Morante, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

The record on appeal does not contain a transcript of the evidence presented at trial. The facts as summarized by this court on direct appeal are sufficient to provide a factual background. Petitioner married Don Hurt in February, 1988. Petitioner began having an affair with Leonard

Rowe in the summer of 1990. Rowe provided Petitioner with a condominium and paid her to be his "personal secretary." Rowe also gave Petitioner money to buy a pink Cadillac. In December of 1990, Rowe decided to reconcile with his wife. Petitioner became angry and returned to live with her husband, Don Hurt. The affair between Petitioner and Rowe continued, however, and Petitioner continued to work for Rowe. In the direct appeal, our court set forth the remaining pertinent facts as follows:

> Wanda Hudgins testified that in January 1991, she had a conversation with Sharon Hurt about Don Hurt. Sharon stated that she was "sick" of her husband and "couldn't stand him" because he was "smothering her." On another occasion, Hudgins went with Sharon to meet with Rowe at his place of business. Sharon began to tell Rowe "how much trouble" Don was causing her. Rowe then took some letters out of a safe and Sharon told Hudgins that she was keeping these letters for "ammunition" for when she could divorce Don because she was "not leaving with nothing. I'm going to take him for everything." Rowe then reached into his desk, pulled out a gun, and said "I have something that will take care of Don Hurt." Rowe later attributed this behavior to "acting macho" and "running off at the mouth."

> Rowe testified that as a result of his affair with Sharon Hurt, he met some of her family, including her sister and brother-in-law, Appellants Marcie and James Murray [who were convicted along with Petitioner]. In February 1991, the Murrays told Rowe that Don Hurt had borrowed $15,000 from them, had not paid any of it back, and as a result, they were going to "kill the son-of-a-bitch." Rowe also testified that around this time, Sharon Hurt told him that she had offered James and Marcie Murray money to shoot her husband.

> Hudgins testified that Sharon Hurt called her in May 1991 and requested some information. Sharon knew that Hudgins' first husband had been killed in an accident and she asked Hudgins how to determine the amount of life insurance she should have on Don. She also asked questions about how long it took to receive insurance proceeds after a person died and how to make a claim.

>     . . . .

> During the early morning hours of June 11, 1991, Don Hurt was driving his truck near the Tennessee River when what he later described as a red or orange 1979-81 Firebird or Camaro type vehicle pulled alongside of his cab and someone in the car fired a shotgun at him. The slug penetrated the side of the truck just behind the driver's door, passed through the driver's seat, went through Don Hurt, ricocheted against the windshield, and landed on the floorboards near the passenger side of the vehicle. Don Hurt, who suffered gunshot wounds to his left shoulder and neck, was transported to the Camden Emergency Room and from there was taken to Columbia HCA Regional Hospital in Jackson. [He was discharged seven days later.]

. . . .

Rowe testified that shortly after the shooting, he had a conversation with Sharon Hurt during which she said that "Marcie and Jimmy had messed the job up and she would have to take care of it herself." Shortly afterwards, Rowe saw all three Appellants in his office. At this time, Marcie and James Murray told him that they shot Don Hurt with a 12-gauge shotgun while he was driving on the interstate. Marcie Murray also told Rowe that they were going to go to the hospital to inject air into the tubes that fed Don intravenously. James Murray told Rowe that if he told anyone about the incident, "we don't mind taking your life and your whole damn family."

. . . .

Rick Hurt testified that while he was visiting his father in the hospital the day after the shooting, Sharon Hurt stated that whoever shot Don "didn't finish the job, but they would be back to finish it." When Rick replied that "snipers don't come back," Sharon responded "well, they'll be back."

. . . .

Rowe testified that on the morning or early afternoon of December 19, 1991, Sharon Hurt telephoned him and asked to meet with him at a restaurant. When Rowe arrived at the restaurant at 1:00 or 2:00 p.m., Sharon Hurt and James and Marcie Murray were outside in Sharon's car. Rowe walked up to the car and James Murray asked him about a .38 pistol that Rowe had recently purchased. Rowe retrieved the gun from his truck and James Murray asked if he could borrow the gun for a few days. Rowe agreed and gave the gun to James Murray. Rowe also testified that Sharon Hurt knew that he kept this gun in his truck at all times. Rowe denied having any knowledge that the group was planning to kill Don Hurt at this time.

Mickey Dalton testified that on December 19, 1991, at approximately 8:00 p.m., she was driving down Williamson Road near the intersection of Old Springfield Highway in Goodlettsville. Because few cars ever parked on the side of the busy roads in that area, her attention was drawn to two cars that were parked on the side of the road. The car in the rear was an older gold colored car while the car in the front was a newer "light pastel funny colored kind of pastel car," that appeared to be a make and model similar to a Cadillac Seville. She noticed that two people were sitting in the front of the newer looking car.

The police discovered Don Hurt's body sitting on the passenger side of his gold colored vehicle on Williamson Road at approximately 11:00 a.m. on December 20, 1991. An autopsy revealed that Don Hurt had sustained two gunshot wounds to the left side of his head, one at near contact and one at contact. Each shot, although closely placed to each other, was fired from a different angle. Both of

the shots were fatal and Don would have been immediately unconscious. The autopsy revealed that Don's time of death was between 7:30 and 8:00 p.m. on December 19, 1991. Firearms specialist Steve Scott testified that a bullet fragment retrieved from Don Hurt's head and a fragment found lying on the floor of Don's car were both .38 caliber bullets.

Doctor Charles Harlan testified that an examination of Don Hurt's blood revealed that he had consumed one to two mixed drinks within one hour of his death. In addition, his blood contained quantities of the antidepressant Elavil and diphenhydramine, commonly known as Benadryl. Doctor Harlan testified that Benadryl can be used as a sedative as it has the side effect of making a person feel sleepy. Don's blood contained an amount of Benadryl that was approximately twenty times greater than the normally accepted therapeutic level. Benadryl is fast acting and will reach maximum effectiveness within one hour. Doctor Harlan testified that this high level of Benadryl mixed with alcohol would have made Don drowsy. Benadryl could be obtained in capsule form or in liquids either with flavor or without.

. . . .

Rowe testified that when he learned of Don Hurt's death, he called James Murray to ask him if he had his .38 pistol. James told him that he had disassembled it and strewn it along the interstate on the way back to Sevierville, Tennessee. James also stated that he and Marcie had thrown their blood soaked clothes off a bridge into a river on their way home.

. . . .

Rowe testified that at some point after the funeral, Sharon Hurt told him that "She wouldn't have went along with them to murder [Don] if she had known they were going to beat him up like that." Sharon later told him that she was angry with the Murrays because they had taken Don's gold and diamonds and that she was going to deduct that from the amount of money that she owed them.

. . . .

Rowe testified that in July 1992, he asked James Murray to tell him precisely what happened the night that Don was murdered. James told him that they had put "mickeys" in Don's drinks and then the three of them walked him through the front door and out to the car. James and Marcie then each shot Don in the head. . . .

*State v. Murray, et al, supra.*

**Post-Conviction Petition**

On the State's motion to dismiss the petition for post-conviction relief, the trial court heard arguments by the parties. No evidence was presented at the post-conviction hearing.

In this case, the Tennessee Supreme Court denied permission to appeal on June 28, 1999, and Petitioner filed the petition for post-conviction relief on September 4, 2001. A petitioner has one year beyond the "date of the final action of the highest state appellate court to which an appeal is taken" in which to file a petition for post-conviction relief. Tenn. Code Ann. § 40-30-202(a) (1997). The statute of limitations had clearly expired before Petitioner filed her petition. Petitioner argues an exception, however, to the statute of limitations pursuant to Tenn. Code Ann. § 40-30-202(b).

A court may entertain a post-conviction petition filed after the expiration of the statute of limitations if: (1) the claim is based upon the final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial; (2) the claim is based upon new scientific evidence establishing that the defendant is actually innocent of the offense; or (3) the claim seeks relief from a sentence that was enhanced because of a previous conviction which has subsequently been held to be invalid. Tenn. Code Ann. § 40-30-202(b) (1997).

Petitioner contends that new scientific evidence of her actual innocence entitles her to post-conviction relief. The evidence upon which Petitioner relies is a letter from the legal department of the Pfizer Corporation, the manufacturer of Benadryl, which states that Benadryl was not available in a clear liquid form until 1995, more than three years after the crimes for which she was convicted occurred.

First, we must determine if the letter constitutes "new scientific evidence," as required by the statute. Both the State and Petitioner cite Justice Barker's concurring and dissenting opinion in *Van Tran v. State*, 66 S.W.3d 790, 818-19 (Tenn. 2001), for guidance. Justice Barker wrote:

> The Post-Conviction Procedure Act of 1995 does not define "new scientific evidence" as used in Section 40-30-217(a)(2). It seems to me that two reasonable constructions of the phrase are possible. First, the language could be narrowly construed to mean only scientific evidence which either was not developed or was not in existence at the time of the petitioner's original post-conviction proceeding. Alternatively, the language could be given a broader construction by including scientific evidence which, although in existence, was not available to the petitioner at the time of his original post-conviction proceeding by the exercise of due diligence. I would give the statutory language the broader construction because I believe that it more nearly effectuates the intent of the General Assembly.

Petitioner argues that the "exculpatory proof" was not available to her at the time of trial, thus making it new, because the trial court denied her motion for state funds to employ the services of an

expert. This court affirmed the trial court's denial of Petitioner's request. *State v. Murphy, et al, supra.* Furthermore, Petitioner successfully obtained the letter prior to presenting this post-conviction claim without the assistance of state funds or an expert. We conclude that "by the exercise of due diligence," a letter stating the forms in which Benadryl was available at the time of the offenses could have been easily obtained. Petitioner's discovery that Benadryl was not produced in a colorless, tasteless form at the time of the offenses is not new scientific evidence.

Even if the letter constituted new scientific evidence, it fails to establish Petitioner's actual innocence of the crimes for which she was convicted. Petitioner argues that this evidence "contradicts the State's theory of prosecution." Specifically, Petitioner contends that she could not have mixed purple, grape-flavored Benadryl with her husband's drink without his detection. Petitioner argues that this evidence debunks the State's theory that she drugged and incapacitated her husband before he was killed. The victim in this case died as a result of gunshot wounds to the head. Therefore, the evidence fails to establish Petitioner's actual innocence. At most, the evidence could have been used at trial to impeach Dr. Harlan's testimony that Benadryl could be obtained in a tasteless form when the crimes were committed. Petitioner is not entitled to relief.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE