IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 24, 2006 Session

## STATE OF TENNESSEE v. DANNY STRODE

**Appeal from the Circuit Court for Marion County**
**No. 7310    J. Curtis Smith, Judge**

No. M2005-00906-CCA-R9-DD - Filed June 8, 2006

The defendant, Danny Strode, was indicted by the Bledsoe County Grand Jury for one count of premeditated murder, one count of felony murder and one count of especially aggravated robbery. The State sought the death penalty.  The defendant asserted he could not be put to death because he was mentally retarded within the meaning of Tennessee Code Annotated section 39-13-203(a).  The trial court held a hearing and determined that the defendant was indeed mentally retarded under the definition provided in the statute and therefore could not be sentenced to death.  The State requested permission to pursue an interlocutory appeal which was granted by the trial court.  On appeal, we determine that the defendant is not mentally retarded under the definition of the statute and, therefore, reverse the judgment of the trial court.

**Tenn. R. App. P. 9 Appeal as of Right; Judgment of the Trial Court is Reversed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Paul G. Summers, Attorney General & Reporter; Michelle Chapman McIntire, Assistant Attorney General; J. Michael Taylor, District Attorney General, and James W. Pope, III, Assistant District Attorney General, for the appellant, State of Tennessee.

Cynthia A. LeCroy-Schemel, Chattanooga, Tennessee, for the appellee, Danny Strode.

## OPINION

Factual Background

On March 25, 2002, the Bledsoe County Grand Jury indicted the defendant for the beating death of Harvey Brown, a local store owner.  His charged offenses included one count of first degree

premeditated murder, one count of felony murder and one count of especially aggravated robbery. The State filed a notice it would seek the death penalty. On September 21, 2004, the defendant filed a motion to strike the death penalty asserting that he was mentally retarded. In October of 2004, the State requested that the defendant undergo a mental evaluation. An agreed order was entered January 5, 2005 requiring the defendant to be evaluated. On March 2, 2005 the trial court held a hearing on the issue of whether the defendant was mentally retarded.

## Evidence at Hearing

Margie Strode Crawford testified at the hearing. Sometime after March,1993 she took in the defendant as a foster child.[1] The defendant was twelve years old at the time. Ms. Crawford adopted the defendant sometime thereafter, and he took the last name Strode. She testified that the defendant never made friends very easily, and he did not fit in well with society. He had problems with "basic matters of hygiene." She stated that she had to keep after him to brush his teeth, take a bath and dress in presentable clothes. She believed that he did not understand why he needed to stay clean and brush his teeth. Ms. Crawford also did not believe that the defendant had the proper background to "catch on" to things he needed to do around the house. The defendant also did not do well in school. Ms. Crawford did not believe that the defendant could ever live independently. Ms. Crawford met with Dr. Robert W. Brown, Jr. and filled out a survey discussing the defendant. On cross-examination, Ms. Crawford testified that she was keeping four to six foster children at the same time she kept the defendant. She also stated that the defendant only stayed with her about two years and left when he was thirteen or fourteen. After he left, she only saw him one time at a "house that was for disturbed children" and not again until he was arrested for the incident in question.

Dr. Brown testified at the hearing on behalf of the defendant. He saw the defendant four different times on four different days in 2004. These visits included clinical observations, interviews, review of records with the defendant, and psychological testing. Dr. Brown estimated that he spent a total of twenty hours with the defendant. Dr. Brown asked the defendant about several incidents that were reported in documents supplied to Dr. Brown. The defendant was unable to give much additional information and claimed that he could not remember many of the incidents about which Dr. Brown asked him. Dr. Brown also interviewed Margie Strode Crawford, the defendant's foster and later adoptive mother. Prior to testing the defendant's I.Q., Dr. Brown tested the defendant to ensure that he was not malingering. Following the administration of nine tests, Dr. Brown concluded that the defendant was not malingering or attempting to fake a psychiatric disturbance. The defendant's scores were low on these tests. As a result of the low scores, Dr Brown tested the defendant's verbal learning memory and discovered that the defendant had significant problems in this area. Dr. Brown also did testing to determine the defendant's I.Q. Dr. Brown testified that he administered the Wechsler Adult Intelligence Scale, the Third Edition ("WAIS-III"). Dr. Brown stated the following regarding the Matrix Reasoning Subtest, which is included in the WAIS-III:

---

[1]Ms. Crawford remarried and became Margie Strode Crawford sometime after the defendant left her care.

Q.      All right.  One of the, I guess, subtest, if you will, or parts of the instruments was the Matrix Reasoning –

A.      (Interposing) Yes, ma'am.

Q.      Subtest.  Can you tell us what that is and what showed, what you did from there?

A.      The instrument is looking at some designs and you're relying primarily on visual spacial functions, right hemispheric functions to recognize and pick from these designs.  It's a new test and I really like it.  It has excellent research behind it, but we've run into problems with it and I've found that over time particularly when there's a question of brain damage, traumatic brain injury, strokes, severe dementia, that I can't rely on it and other neuropsychologist [sic] have found the same thing.  Our opinion is and that's to be debated yet with peer review and additional research is that it maybe [sic] the publisher was a little premature in issuing this subtest.  What they did is they replaced a test that had been used in all previous versions called the Object Assembly Test with the Matrix Reasoning Test and there's good rational [sic] for that.  Fortunately they retained it as a optional test to give the Object Assembly Test if for any reason there's problems with the Matrix Reasoning Test.

Q.      And I believe you actually encountered problems with the Matrix Reasoning Test, is that correct, as it was presented to Danny?

A.      Well, it was a high score and I have seen this routinely in cases of this type.

Q.      So when you say high score what do you mean?

A.      Well, it was relatively higher than the rest of the scores and I don't trust it, even if it were a lower score I have doubts in the instrument the way it's currently designed it needs some revision.

Q.      All right.  So what did you then do because of this score?

A.      I replaced that which is standard procedure in the manual with a Subtest called the Object Assembly Test –

Q.      (Interposing) And that's the old test?

A.      That's the old test.

Q.      Or the previous test that had been used.

A.	But it's still included with the WAIS-III battery.

Q.	Very well. And what was your conclusion or your findings in replacing that?

A.	That his score overall dropped just slightly on the Full Scale IQ which is the critical question in a case such as this and it resulted in Full Scale IQ score calculated as 69. The critical issue here is that mild mental retardation is diagnosed with IQ scores ranging from 50 to 55 up to 70 and here is a score a Full Scale IQ of 69. However that score must be taken in consideration all the other scores on the tests, because we have a range that go from mild MR., mild retardation on up into low average performance and we have a range of scores, so the IQ, the Full Scale IQ Test does not tell the whole story and you'd have to do further analysis to – because it's quite possible that an individual can have some scores that are up in superior range, you know, but on so many other scales so low that they would perform very low on a Full Scale IQ, so you can't always go by – and some time I literally throw out the Full Scale IQ., because it doesn't provide me manful [sic] information.

Dr. Brown also testified that he reviewed results of previous I.Q. tests that the defendant had taken. The results for the previous tests showed that the defendant had a Full Scale IQ of 88 in 1990 when he was nine years old, 75 in 1992 when he was eleven years old, 78 in 1995 when he was fourteen years old and 78 in 1996 when he was fifteen years old. Dr. Brown stated that a decrease in I.Q. score as one ages is to be expected in an individual with a learning disorder.

Dr. Brown stated that to determine whether an individual is classified as mentally retarded, you must assess his adaptive function as well as academic achievement. In his review of the defendant's documentation, Dr. Brown did not find any records from his school age years where anyone had formally evaluated his adaptive function. Because there had been no formal evaluation, Dr. Brown spoke with Margie Strode Crawford, who was the defendant's foster mother and later adoptive mother, to ascertain the defendant's adaptive behavior when he was in his school years. From that interview, Dr Brown determined that the defendant suffered from some serious cognitive defects, but did not have a history of any traumatic brain injury or neurological disease that would impact his neurological functioning. Ms. Crawford told Dr. Brown that she did not believe that the defendant could ever live independently. Dr. Brown also relied upon a report from Youth Villages, where the defendant lived after leaving Ms. Crawford's home in which Youth Villages did an appraisal at age nineteen and determined that the defendant "lacked independent living skills necessary for successful living following discharge."

Dr. Brown determined that the defendant met the first two prongs for the definition for mental retardation in Tennessee Code Annotated section 39-13-203(a). However, he stated that there was a problem with the third prong which requires that the diagnosis occur before the age of eighteen. However, Dr. Brown was convinced that the defendant's problems were present when he

was in kindergarten as well as the present time. Therefore, Dr. Brown opined that the third prong had been met.

On cross-examination, Dr. Brown stated that the defendant was adapting to the jailhouse environment pretty well. The defendant had no complaints. Dr. Brown admitted that if he had left the Matrix score in his calculation of the defendant's Full Scale I.Q., the defendant's score would have been 71. Dr. Brown testified that there was a 94 percent probability that the defendant's I.Q. score fell within the range of 66 to 74. He agreed that the defendant's score could have been as high as 74. Dr. Brown agreed that the defendant stated that he failed the third grade because, "I just don't study and I stopped trying very hard." The witness also agreed that when the defendant was evaluated at age fifteen he reported that he enjoyed playing in the woods, riding bicycles and playing football on a community team as a tackle and defensive end. Dr. Brown stated these were not unusual past times for a fifteen-year-old boy. The following exchange also occurred:

Q.     You note in your report, Doctor Brown, that Mr. Strode had been tested over a period of years in 1990, '92, '95, and '96.

A.     Correct.

Q.     And on everyone of tests [sic] his overall IQ scores had ranged from a high 88 to a low of 75 with two in the 78s scale?

A.     Correct.

Q.     All right. Is it not true, Doctor Brown, that intelligence tests are valid for the time period or the age period of which they are conducted?

A.     If the instrument are found to be valid and the examiners are satisfied, the data is reliable, yes.

Q.     Okay. So these scores are valid?

A.     Yes, they are.

Q.     Your scores, your tests was [sic] administered when Mr. Strode was 23 years of age, two years and eight months after the incident which brings us to court here, but are you saying, Doctor, that because you find an overall IQ of 69, as you stated in 2004, that we can project back and say that he had an IQ of 70 or less before he was 18 when his test scores do not show that?

A.     No, I cannot say that.

. . . .

Q.      . . . Are you also aware from the records provided you, Doctor Brown, that when he was admitted or placed in the Department of Correction in August of 2003, Mr. Strode was given a IQ test at that time?

A.      Yes, the BETA-III.

Q.      All right. On that he scores intelligence quotient of 84.

A.      I thought it was 87.

. . . .

Q.      The Beta-III yielded an intelligence quotient of 84, which is indicative of low average level.

A.      Yes.

Q.      All right, but certainly not retarded?

A.      No.

Q.      And that was about a year before your testing was done?

A.      That's correct.

When asked about the defendant's work history, Dr. Brown agreed that the defendant had reported that he had worked as a backhoe operator, a dairy farmer, a factory worker and in the fast food industry. The defendant also reported that he wanted to get his GED and learn a trade. At the conclusion of the State's cross-examination, the following exchange occurred:

Q.      Doctor, based upon the test scores available for you for Mr. Strode prior to the time he was 18, the test scores other than your own that were given to him after he was 18, can you honestly say with a reasonable degree of psychological certainty that his, as you call it retardation had manifested itself prior to age 18?

A.      At least one record uses that terminology that his IQ scores dropped into the upper end of the mild range of mental retardation, with that data alone this psychologist could not render a diagnosis of mental retardation.

Q.      Well, what I'm saying in all of the test scores that I've seen you reference in your report, prior to age 18 showed an IQ a minimum of 75 and a high of 88.

A.      Correct.

Q.      And one in 2003 after age 18, showed an – shows in my report of 84, so based on that, the ones prior to 18, you could not say even if he was mental retarded today that it manifested itself prior to age 18, could you?

A.      Can't make that conclusion.

Q.      You can't say it?

A.      I can't answer your question, because the case would need further assessment. The records do not show that he met the criteria of diagnosis for mild mental retardation.

Q.      Prior to age 18?

A.      Correct.

Q.      Which is one of the prongs of the statute we're concerned with here today?

A.      Yes.

On redirect, the witness stated that the "developmental period" can be up to age 24 or 26. Dr. Brown stated that in the defendant's case, his developmental period lasted until age 24 or 26.

Dr. Eric Engum is a licenced clinical psychologist who was consulted by the State. He reviewed the tests conducted by Dr. Brown, as well as the previous psychological evaluations that Dr. Brown relied upon in his evaluation of the defendant. After reviewing all the documents provided to him, Dr. Engum found that there was no evaluation of the defendant's I.Q. which showed he had an I.Q. lower than 70. The defendant's scores ranged from 88 to 75. A score of 75 placed the defendant in a classification known as borderline intellectual functioning, which is not the same as mental retardation. Dr. Engum testified that when comparing the WAIS-III and the BETA-III, both tests would be considered the "gold standards" for IQ tests. But, different tests have different focuses. The WAIS-III takes one and a half hours to administer while the BETA-III takes about forty-five minutes to administer. Dr. Engum also testified that the Diagnostic Statistical Manual IV states that mental retardation must occur before age eighteen. Dr. Engum could find nothing in any of the reports that indicated the presence of mental retardation before the age of eighteen. Dr. Engum did believe that there were emotional, behavioral, and possibly problems related to Attention Deficit Disorder with a learning disability. However, he believed that the majority of the defendant's problems were motivational.

Dr. Engum then testified concerning Dr. Brown's testing of the defendant. He stated that Dr. Brown's decision to throw out one of the subtests prior to scoring was against the rules of the

creators of the test. The manual for the WAIS-III does provide for the substitution of one Subtest for another when the test is "spoiled." A test is spoiled if there is a disruption during the examination period. Dr. Engum did not find any reason that the defendant's test was spoiled. He also did not believe it was in the test-giver's discretion to throw out a subtest. Dr. Engum then testified regarding the scoring of the defendant's I.Q. test. Dr. Engum testified that Dr. Brown made an error in scoring the I.Q. test when dealing with the Matrix Reasoning test and actually got a higher score than he would have if the test had been scored correctly. Dr. Engum stated that when he did the recalculations, he arrived at an I.Q. score of 69. Dr. Engum stated that "to some degree Dr. Brown jumped through hoops to try to get many plague [sic] IQ and basically the mistake was made in scoring error." The result is an actual I.Q. score of 69.

Dr. Engum also testified with regard to malingering. His conclusion was different from Dr. Brown's with regard to this issue. Dr. Brown believed without a doubt that the defendant was not malingering. Dr. Engum believed that based on a few of the scores on the tests, "there are a number of performances which put [the defendant] on the borderline" as far as the defendant malingering. Dr. Engum also reiterated that this assessment did not rise to clear and convincing evidence that the defendant was malingering. But rather, there was a suggestion that he might be malingering.

At the conclusion of his testimony, Dr. Engum analyzed the three prongs of Tennessee Code Annotated section 39-13-203(a) with regard to the defendant. He made the following conclusion:

Q.      . . . [Y]ou've looked at the records and been provided the same information that Doctor Brown had in his summary, his report, let's go through them as to the factor of the statute that says an IQ of 70 or below prior to – by age 18, is that present?

A.      No, sir. He does not meet the statutory requirements for that as demonstrated across four different assessments and in each case he fell at minimum in the borderline range in one case and low average range and there is simply no support that he was mental retarded prior to age 18.

Q.      The second prong of the statute says there must be deficits in adaptive behavior, other than Mrs. Crawford's report concerning his activities at age 13, did you find any evidence in the records indicating that he suffered form deficits in adaptive behavior by age 18 that was associated with mental retardation?

A.      No, sir. And just to reiterate my earlier testimony, the assessment of his adaptive skills, abilities, and coping strategies at age 13, cannot and should not be representative of how he was functioning at age 20 or 21, it just simply can't be. It would be like saying somebody's academic development is representative at age 13 of what they're going to be like when they've gone through two years of college, you cannot equate the two. You have to wait until the person achieves that age and then

-8-

actually do some type of assessment and as I said in my report and I will be very opening [sic] in saying it, it's a very difficult process to do.

Number 1. to [sic] get reliable information, particularly from a client who may be sitting in a jail cell, but you may have to end up doing it anecdotically [sic]. You may end up having to do through [sic] review of records or just, you know, analysis of employment records, tax records, motor vehicle records, arrest records and so on and so forth, that may be the way you end up doing it and that administering some type of test whether it be the ABAS or the adaptive behavior skills may not be appropriate way to do it. You may have to do it anecdotically [sic].

Q. And I think you have already answered the question by saying that the first two prongs of the statute you find no evidence that they existed in the record before you by age 18 and that is of course that is the third, this mental retardation must manifest itself by age 18, is that correct?

A. You're exactly right.

Dr. Engum also testified that the developmental period according to two authoritative tests states clearly is prior to age 18. This concluded the testimony at the hearing.

At the conclusion of the hearing, the trial court determined that the defendant was mentally retarded for purposes of Tennessee Code Annotated section 39-13-203. The trial court's order reads as follows:

The first prong of the statutory definition of mental retardation requires an I.Q. of seventy (70) or below. Dr. Robert Brown, Jr., testified on behalf of the defendant. He is imminently qualified and found defendant's I.Q. at the age of 23 to be 69. Dr. Eric Engum testified on the state's behalf and agreed defendant's I.Q. at age 23 was 69, even though he disagreed with some of Dr. Brown's procedures and reasoning. Dr. Brown further testified defendant would have had the same I.Q. of 69 at age 20. Defendant was 21 years of age when he was charged with the murder of Harvey Brown. Thus, defendant has established the first prong of the test.

The second prong of the test for mental retardation under our statute requires "deficits in adaptive behavior" which has been defined as "the inability of an individual to behave so as to adapt to surrounding circumstances." State v. Smith, 893 S.W.2d 908, 918 (Tenn. 1995). Defendant's adaptive behavior deficits were established by Dr. Brown's report and by his and Ms. Crawford's testimony. The proof established defendant has significant limitations in the areas of communication, self-care, home living, social skills, self-direction, functional academics and work.

Therefore, defendant has established the second prong of the statutory definition of mental retardation.

The third and final prong of the test requires defendant's intellectual and adaptive deficits to "have manifested during the developmental period, or by eighteen (18) years of age." The statute therefore provides two means by which the deficits can be manifested; either (1) during this developmental period or (2) by age 18.

As to the first method, T.C.A. § 33-1-101(17)(B) in defining mental retardation for mental health and developmental disabilities purposes, requires that deficits in intellectual and adaptive skills "manifest before eighteen (18) years of age." This court must presume that the legislature was aware of that definition when it enacted § 33-13-203(a)(3), yet purposely chose to adopt a different definition of mental retardation to be applied in the criminal context. While the two statutes both touch upon the same subject matter, they do not contain identical provisions. This court notes that essentially, the state argues the words "or by" in T.C.A. § 33-13-203(a)(3), should be read "which is defined as." Clearly, the legislature could have defined "developmental period" as between birth and the eighteenth birthday, but chose not to do so. The addition of another time frame to prove mental retardation above that required in T.C.A. § 33-1-101(17)(B) is indicative of the legislature's intent to have a different standard apply to defendants in a capital prosecution.

Neither the statutes nor case law in Tennessee define "developmental period." Dr. Brown defined the term in his testimony: "The developmental period, its an issue in this case, has to do with the brain and cognitive function and its birth through roughly the maturity of the brain between ages 24 and 26." Applying Dr. Brown's definition of "developmental period" which is the only definition in the proof, and accrediting Dr. Brown's report and testimony, this court finds the third prong of the test has been established. See also 20 C.F.R. pt. 404 subpt. P, app. 1512(c) (defining developmental period in social security cases to be by age 22).

In the alternative, this court has considered the second method to establish the required deficits which is "by eighteen (18) years of age." The records established that the defendant's I.Q. was tested four times by age 15. No testing, however, was performed between ages 15 and 18. Although has first score at age 8 showed an I.Q. of 88, his I.Q. in 1992 at age 11 was shown to be 75. Both at age 13 and 15 the test produced an I.Q. of 78. On his 1992 report, the tester indicated that once the standard error of measurement was considered, his score may have fallen within the mild retardation range. Dr. Brown reported defendant's academic achievement decreased over time which he believed established a decreasing I.Q. Under all circumstances, and with the testimony and evidence of the defendant's decreasing abilities with age and his continued inability to adapt, the court finds by a preponderance of the evidence that the defendant's mental retardation manifested

prior to age 18 assuming <u>arguendo</u> that such is the standard.  Since defendant has established all three prongs of the test, this court finds defendant was mentally retarded as defined in T.C.A. § 39-13-203(a) at the time of the offense and is ineligible for the death penalty pursuant to T.C.A. § 39-13-203(b).

On March 23, 2005, the State requested an interlocutory appeal from the trial court's determination that the defendant was mentally retarded.  The trial court and this Court granted the State's request.

## ANALYSIS

The State appeals from the trial court's determination that the defendant was ineligible for the death penalty because he was considered to be mentally retarded under the definition provided in Tennessee Code Annotated section 39-13-203(a).  The State argues three issues: (1) the trial court incorrectly determined that Tennessee Code Annotated section 39-13-203 allows for the manifestation of mental retardation past the age of eighteen; (2) there is no proof in the record to support the trial court's finding that the defendant had an I.Q. of 70 or below prior to his eighteenth birthday; and (3) the evidence preponderates against the trial court's finding that the defendant suffered deficits in adaptive behavior prior to his eighteenth birthday.

For a defendant to be found mentally retarded and therefore ineligible for the death penalty, he must meet the definition for mental retardation as provided in Tennessee Code Annotated section 39-13-203.  This statute states:

> (a) As used in this section, "mental retardation" means:
> (1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligance quotient (I.Q.) Of seventy (70) or below;
> (2) Deficits in adaptive behavior; and
> (3) The mental retardation must have been manifested during the developmental period, or by eighteen (18) years of age.

Tenn. Code Ann. § 39-13-203(a).  Shortly after the enactment of Tennessee Code Annotated section 39-13-203, our supreme court held in <u>Van Tran v. State</u>, 66 S.W.3d 790 (Tenn. 2001) that the execution of mentally retarded defendants constitutes cruel and unusual punishment under the constitutions of both the United States and the State of Tennessee.  66 S.W.3d at 809.[2]  The burden of persuasion to demonstrate that he is mentally retarded is on the defendant, and the trial court must

_____

[2]See also, <u>Atkins v. Virginia</u>, 536 U.S. 335, 12 S.Ct 2242 (2002) (holding the Eighth Amendment to the United States Constitution which prohibits "cruel and unusual punishment" precludes the death penalty for persons adjudicated mentally retarded.

determine by the preponderance of the evidence whether a defendant is indeed mentally retarded. Tenn. Code Ann. § 39-13-203(c). The question of whether an individual is mentally retarded for purposes of application of the death penalty is a mixed question of law and fact. Therefore, the trial court's findings must be reviewed with a presumption of correctness and only reversed when the preponderance of the evidence is contrary to the findings of the trial court. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). When reviewing the application of the law to the facts, this court must conduct a purely de novo review. Id. at 457.

## Statutory Interpretation

The State first argues that the trial court incorrectly determined that Tennessee Code Annotated section 39-13-203(a)(3) allows for the manifestation of mental retardation past the age of eighteen. The defendant argues that the inclusion of the phrase "developmental period, or by eighteen (18) years of age" in the statute allows for the trial court's extrapolation that the developmental period can extend beyond the age of eighteen. Therefore the questions presented is what is meant by the phrase "developmental period, or age eighteen (18)" as stated in Tennessee Code Annotated section 39-13-203(a). Because this question is an interpretation of a statute, it is purely a question of law and is subject to a de novo review.

Generally, when construing a statute, every word within the statute is presumed to "have meaning and purpose and should be given full effect." State v. Odom, 928 S.W.2d 18, 29-30 (Tenn. 1996) (quoting Marsh v. Henderson, 424 S.W.2d 193, 196 (Tenn. 1968)). This Court's primary duty in construing a statute is "to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995); see also State v. Davis, 940 S.W.2d 558, 561 (Tenn. 1997). Legislative intent should be gleaned from the "natural and ordinary meaning of the language used, without a forced or subtle construction that would limit or extend the meaning of the language." Carter v. State, 952 S.W.2d 417, 419 (Tenn. 1997). Furthermore, this Court should construe a statute so that its component parts are consistent and reasonable, and inconsistent parts should be harmonized, where possible. State v. Odom, 928 S.W.2d at 30.

In its order, the trial court determined that a defendant could be found to be mentally retarded under Tennessee Code Annotated section 39-13-203(a)(3) because the term "developmental period" lasted until age twenty-four and was a separate time period during which mental retardation could manifest under the statute. The trial court relied in part upon the definition of mental retardation found at Tennessee Code Annotated section 33-1-101(17)(B) which states that mental retardation must manifest by age eighteen. The trial court stated that this statute was in effect at the time the legislature enacted Tennessee Code Annotated section 39-13-203, and by including the phrase "developmental period" the legislature intended to give trial courts an alternative for the diagnosis period beyond the age of eighteen when determining eligibility for capital sentencing. The trial court also relied upon the testimony of the defendant's expert witness, Dr. Brown who stated that the developmental period can last up to age twenty-four. The trial court stated that Dr. Brown's definition of developmental period was the only definition submitted into evidence. However, in

our review of the record we found that Dr. Engum also testified as to the definition of developmental period with regard to the diagnosis of mental retardation. Dr. Engum stated that under two tests used to diagnose mental retardation "developmental period" was defined as up to age eighteen.

We first look at the plain meaning of the words used in the statute. The legislature stated that mental retardation must have "manifested during the developmental period, or by age eighteen (18)." From a standpoint of the natural and ordinary meaning of the words, it would appear that the age of eighteen would be the cutoff point for diagnosis. If the legislature had intended the developmental period to extend beyond age eighteen, the statute would state a later age. In addition, the wording of the statute leads one to conclude that "developmental period" is shorter than eighteen years. One would assume that a time period longer than eighteen years would be implied by wording which read, "by the age or eighteen, or during the developmental period."

In Van Tran v. State, 66 S.W.3d 790 (Tenn. 2001), our supreme court analyzed Tennessee Code Annotated section 39-13-203. In analyzing the definition of mental retardation the court referenced the definition included in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") and stated, "[l]ike the statutory definition, the DSM-IV requires that the intellectual and adaptive deficits manifest themselves by the time the person is eighteen years of age." Van Tran, 66 S.W.3d at 795.

In State v. Howell, 151 S.W.3d 450 (Tenn. 2004), our supreme court recently analyzed the definition of mental retardation under Tennessee Code Annotated section 39-13-203. The court first stated that mental retardation is very difficult to define, and that this has been admitted by the United States Supreme Court. Howell, 151 S.W.3d at 457. Our supreme court then outlined the prevailing definition of mental retardation as, "significantly subaverage intellectual functioning accompanied by related limitations in two or more adaptive skill areas . . . and manifestation of the condition before age 18." Howell, 151 S.W.3d at 457. The supreme court also stated that this is the definition quoted by the United State Supreme Court from the American Association of Mental Retardation and the American Psychiatric Association and included in the Supreme Court's opinion in Atkins v. Virginia, 536 U.S. 304, 308 n.3 (2002).

Our supreme court then went on to further analyze Tennessee Code Annotated section 39-13-203 comparing the definition of mental retardation included in Tennessee Code Annotated section 33-1-107(17). This statute concerns the State's providing of social services and is the same statute that the trial court relied upon in reaching its conclusion in the case sub judice. In Howell, our supreme court stated:

> As is evident, [Tennessee Code Annotated section 33-1-107(17)] contains no reference to numerical I.Q. scores and is therefore less restrictive than Tennessee Code Annotated section 39-12-203(a). Additionally, section 33-1-107(17) was in existence at the time the legislature enacted section 39-13-203(a). Therefore, we must presume the legislature was aware of section 33-1-107(17), yet purposely chose

to adopt a different definition of mental retardation to be applied in the criminal context. That the two statutes both touch upon the same subject matter, yet contain dissimilar provisions, is <u>indicative of a legislative intent to have a different, more restrictive standard apply to defendant in a capital prosecution</u>.

<u>Howell</u>, 151 S.W.3d at 458 (emphasis added).

Clearly, our supreme court interprets the language, "during the developmental period, or by eighteen" included in Tennessee Code Annotated section 39-13-203 as not including the years past the age of eighteen. Therefore, we conclude that our supreme court interprets Tennessee Code Annotated section 39-13-203(a) as requiring that mental retardation manifest before the age of eighteen.

This conclusion is also supported by the legislative history for Tennessee Code Annotated section 39-13-203. Roger Blue, an expert in mental retardation, testified at the Senate Judiciary Committee hearings on the statute. Mr. Blue stated:

The definition as spelled out in this legislation is the accepted definition of the American Association on Mental Retardation, which is a universally accepted definition used in the field. The substantial subaverage intelligence is one of three things that have to exist for someone to be considered to – have mental retardation as opposed to other types of handicaps. The reference to subaverage intelligence, the general level I.Q. used in testing . . . generally the I.Q. of 70 and below is considered to be substantially subaverage intelligence. It also has to be accompanied by – a deficit in adaptive behavior. <u>It also has to have occurred during the developmental years, which means you are either born with it or in early childhood develop it</u>.

Tenn. Sen. Jud. Comm., <u>Debate on House Bill 1851</u>, March 13, 1990 (emphasis added). "Developmental period" according to this expert is restricted to early childhood. It is reasonable to assume that the senators at the hearing would assume that the term "developmental period" referred to early childhood. In another exchange during debate in the House Judiciary Committee, The sponsor of the bill defined mental retardation as occurring during "the developmental period under eighteen years of age." Tenn. House Jud. Comm., <u>Debate on House Bill 2107</u>, March 13, 1990. Also at this debate, a legislator asked the sponsor of the bill why it was important that the defendant be diagnosed before age eighteen. The sponsor of the bill replied, "Ninety-nine percent are diagnosed before age eighteen years of age. This is a defect that you are born with for the most part." <u>Id.</u> In debate at the General Assembly, The sponsor repeatedly stated that mental retardation must manifest itself before the defendant's eighteenth birthday and that it is a birth defect. Tenn. House, <u>Debate on House Bill 2107</u>, April 5, 1990. When discussing potential retroactive diagnosis of defendants with mental retardation the sponsor emphasized the cut-off of eighteen years of age when

he stated, "[the defendant] would have to be able to show retroactively, however, through expert testimony, that he is in fact mentally retarded and that condition existed prior to his eighteenth birthday. . . . It would have to have been manifested before his eighteenth birthday . . . ." Id.

It does not appear that the legislature intended for the term "developmental period" to extend beyond eighteen years of age.

We have also looked at other states' definitions of mental retardation with reference to application of the death penalty and when they require that symptoms must manifest themselves. A few states' statutes include the term developmental period and specifically state that it ends at eighteen. Ark. Code Ann.§ 5-4-618(a)(1); Conn. Gen. Stat. § 1-1g; Wash. Rev. Code § 10.95.030(2)(e). Many other states' statutes simply set out eighteen years of age as the cut off. Ariz. Rev. Stat. Ann. § 13-703.02 K. 2; Del. Code Ann. tit. 11 § 4209(d)(1); Fla. Stat. § 921.137(1); Idaho Code Ann. § 19-2515A(1)(a); Kan. Stat. Ann. § 76-12b01(d); Mo. Rev. Stat. § 565.030; 6N.C. Gen. Stat. § 15A-2005(a)(1).

Other states refer to the developmental period in the statute, but there is no definition of developmental period included in the statute. Ala. Code § 15-24-2; Cal. Penal Code § 1001.20(a)(1); Colo. Rev. Stat. § 18-1.3-1101(2); Ga. Code Ann. § 17-7-131(a)(3); 730 Ill. Comp. Stat. § 5/5-1-13; Ky. Rev. Stat. Ann. § 532.130(2); Nev. Rev. Stat. § 174.098(7); S.C. Code Ann. § 16-3-20. Alabama is one of those states. The Alabama Supreme Court has interpreted "developmental period" to mean ending at eighteen,"these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)." Ex parte Perkins, 851 So. 2d 453, 456 (Ala. 2002). There are also a small number of states that use the age of twenty-two as a cut off for the manifestation of symptoms. Ind. Code Ann. § 35-36-9-2; Md. Code Ann., Crim. Law § 2-202(b)(1)(ii); Utah Code Ann. § 77-15a-102(2).

We have attempted to find other states who have had similar questions with regard to their statutes. It appears that this issue has rarely, if ever been addressed. In an Oklahoma case, the Court of Criminal Appeals of Oklahoma stated: "[w]hile literature indicates the disability manifests 'during the developmental period,' legislatures, and now the Supreme Court, have extended the manifestation to prior to the 18[th] birthday. This elongated period of discovery gives the benefit of proof to the charged offender . . . ." Murphy v. State, 66 P.3d 456, 460 (Okla. Crim. App. 2003). Our research leads to the conclusion that the majority of states consider the developmental period to end at eighteen.

We conclude that the trial court's interpretation of the phrase "developmental period, or by age eighteen," is incorrect. For a defendant to meet the third prong of Tennessee Code Annotated section 39-13-203(a), the symptoms of mental retardation must have manifested by the age of eighteen. This conclusion is supported by previous opinions of the Tennessee Supreme Court, as well as the legislative history of this statute, the statutes and caselaw of other states, and the DSM-IV, which is the main diagnostic manual in the psychiatric field.

## Proof of Below 70 I.Q. Before the Age of Eighteen

Having determined that the statute does indeed require that the symptoms manifest themselves before the age of eighteen, we now turn to the first prong of Tennessee Code Annotated section 39-13-203(a) which requires that the defendant have, "[s]ignificantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below." Tenn. Code Ann. § 39-13-202(a)(1). The trial court appears to have determined that this prong was met because the defendant had an I.Q. of 69 at the age of 23. The trial court also stated that the defendant's expert witness testified that the defendant's I.Q. at 20, the time of the incident, would have been the same. The trial court also stated in the alternative that an earlier tester of the defendant's I.Q. stated that, adjusted for the margin of error, the defendant's score may have fallen within the mild mentally retarded range.

The State argues that "the defendant never received an I.Q. score below 70 until he was incarcerated and facing first degree murder." The defendant argues that his I.Q. scores decreased over time and there were no scores available for the years between when he was fifteen and eighteen. Furthermore, the defendant states that he scored a 69 at 23 years of age.

The evidence showed that the defendant had been evaluated on more than one occasion for the purpose of establishing his I.Q. In 1990 at the age of eight the defendant scored an 88 on an I.Q. test. In 1992 at the age eleven he scored 75. In 1995 and in 1996 at the ages of thirteen and fifteen he scored 78 both times. There were no additional I.Q. tests administered before the age of eighteen.

Obviously, there are no I.Q. scores for the defendant before the age of eighteen which are below 70 as required by the statute. The trial court states that one earlier tester stated that the defendant's score could fall within the mildly mentally retarded range when adjusted for the margin of error. However, our supreme court previously held that Tennessee Code Annotated section 39-13-203(a) does not provide for a measurement of errors and therefore, the score of 70 is a "clear objective guideline to be followed by the courts when applying the three-prong test . . . ." Howell, 151 S.W.3d at 458. There is no evidence in the record that the defendant had an I.Q. below 70 before he reached the age of eighteen.

The Court faced a similar set of facts in Byron Lewis Black v. State, No. M2004-01345-CCA-R3-PD, 2005 WL 2662577 (Tenn. Crim. App., at Nashville, Oct. 19, 2005), perm. app. denied, (Tenn. Feb. 21, 2005). In Byron Lewis Black, the petitioner's I.Q. had been tested before he reached the age of eighteen. He scored above 70 in every I.Q. test before he reached eighteen. It was only after he became an adult and was over eighteen that his I.Q. scores began to be below 70. We held that the record did not support the proposition that the petitioner had an I.Q. score below that of 70 before the age of eighteen. Byron Lewis Black, 2005 WL 2662677, at *17.

The same is true in the case sub judice. There is absolutely no proof in the record that the defendant had an I.Q. score below 70 before he reached the age of eighteen. Therefore, the evidence preponderates against the findings of the trial court.

**Deficits in Adaptive Behavior Before the Age of Eighteen**

The State also argues that the evidence preponderates against the trial court's findings that the defendant suffered from deficits in his adaptive behavior before the age of eighteen. We note that Tennessee Code Annotated section 39-13-203(a) requires that all three prongs be satisfied in order for a defendant to meet the definition of mental retardation. Because we have already determined that the defendant has not met the burden of proof required for the first prong, that he have an I.Q. below 70 before age eighteen, it is impossible for him to prove that he is mentally retarded under the definition provided in Tennessee Code Annotated section 39-13-203(a). However, out of a sense of judicial economy, we will nonetheless review this issue for purposes of judicial efficiency.

The trial court relied upon Dr. Brown's report and the testimony of Ms. Crawford to determine that the defendant did indeed suffer from deficits in adaptive behavior. However, we note that Dr. Brown's main source for information for the defendant's adaptive behavior prior to eighteen was an interview with Ms. Crawford.

Our supreme court relied upon the definitions in the DSM-IV to define what is meant by the statute's requirement of deficits in adaptive behavior. Van Tran, 66 S.W.3d at 795. In Van Tran, the supreme court stated:

> The second part of the definition-adaptive functioning-"refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, socio-cultural background, and community setting." [American Psychiatric Association, Diagnositc and Statistical Manual of Mental Disorders, 39,] 40 [(4th ed. 1994)]. As discussed, a mentally retarded person will have significant limitations in at least two of the following basic skills: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Id. at 39. Influences on adaptive functioning may include the individual's "education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation." Id. at 40.

Id.

As we stated above, Dr. Brown testified that the defendant's adaptive behavior was not formally evaluated when he was a child, so he had to rely on his interview with Ms. Crawford. Ms. Crawford testified that she had the defendant in her house for about two years. She stated that he did not make friends easily and had problems with his hygiene. Ms. Crawford told Dr. Brown that when the defendant was living with her, she came to the conclusion that the defendant would never

be able to live on his own. Ms. Crawford also stated that when he left her house he was about fourteen years old, and she only had one visit with him before he was arrested for the incident in question. Dr. Brown also relied upon a report from a youth home in Memphis, where the defendant lived after leaving Ms. Crawford's house. That report stated that the defendant's clinical supervisor did not believe that the defendant would be able to live independently. There was also evidence that the defendant had trouble in school.

Dr. Engum concluded that it was unlikely that the defendant had deficits in adaptive behavior. Dr. Engum relied on the fact that the defendant was able to hold several jobs, such as backhoe operator, a dairy farmer, a factory worker, a fast food worker and a babysitter. In addition, the defendant had obtained his driver's license, saved money to purchase a car, and establish some type of living situation.

The trial court held, "The proof established defendant has significant limitations in the areas of communication, self-care, home living, social skills, self-direction, functional academics and work." We find that the evidence presented at trial preponderates against the findings of the trial court. There was not evidence to support deficiencies in all the areas listed by the trial court. As we stated above, the DSM-IV requires deficiencies in only two of the listed areas.

To prove deficiencies in at least two areas, Dr. Brown relied upon the recollections of Ms. Crawford. We question the reliability of the information for diagnosis purposes when Ms. Crawford cared for the defendant for two years from the time he was eleven until he was fourteen. Common experience tells us very few fourteen-year-old children are capable of living on their own. Such experience also informs us that many fourteen-year-olds do not take pains to bathe, dress in presentable clothes, or brush their teeth. There were no formal evaluations completed on the defendant before he turned eighteen. We are unable to conclude from the evidence presented at the hearing that the defendant had adaptive deficits prior to the age of eighteen in two of the basic skills listed in the DSM-IV. This is especially true considering his ability to care for himself, work and obtain a driver's license as an adult. Therefore, the evidence preponderates against the findings of the trial court.

## CONCLUSION

For the foregoing reasons, we reverse the judgement of the trial court and remand for further proceedings in accordance with this opinion.

_____
JERRY L. SMITH, JUDGE